**E-FILED**
Friday, 20 January, 2006  10:14:15 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| THOMAS E. BARON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  05-3240 |
| | ) | |
| FAYEZ CHEHAB, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendants Bank of Springfield (Bank), Michael McGlasson, James Kelley, William Chrans, Stephen K. Bentley, and Better Business Systems of Montana, Inc.'s (BBS) (collectively, the Moving Defendants) Motions to Dismiss Counts II-V, XV, and XVII of the First Amended Complaint (d/e 39).  <u>Bank of Springfield's Motion to Dismiss Counts II, III and V of the First Amended Complaint Pursuant to Rule 12(b)(6) (d/e 43)</u>, <u>Bank of Springfield's Motion to Dismiss Count XV-Unjust Enrichment (d/e 45)</u>, <u>Bank of Springfield's Motion to Dismiss Count XVII-Conversion (d/e 47)</u>, <u>Motion to Dismiss Counts II, III, IV and V of the First Amended Complaint (d/e 49)</u>, <u>Motion to Dismiss</u>

1

Count XVII of the First Amended Complaint (d/e 50), Motion to Dismiss Counts II, III, IV and V of the First Amended Complaint (d/e 51), and Motion to Dismiss Count XVII of the First Amended Complaint (d/e 53). The Plaintiffs attempt to allege claims in Counts II-V, XV, and XVII for violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962 et seq., and state law theories of unjust enrichment and conversion. The Plaintiffs fail to state claims in these Counts against the Moving Defendants. The Motions are therefore allowed.

STATEMENT OF FACTS

The Amended Complaint alleges that the Defendants bilked the Individual Plaintiffs Thomas E. Baron, M.D. and Linda S. Baron (husband and wife), Christopher T. Mallavarapu, M.D. and Janet K. Mallavarapu (husband and wife), and Robert V. Trask, M.D. and Mary L. Trask (husband and wife) (collectively the Individual Plaintiffs) out of millions of dollars through a multi-stage fraudulent investment scheme involving several different aviation enterprises. The remaining Plaintiffs, ROTFL, LLC (ROTFL), and Alpha Foxtrot, LLC (Alpha Foxtrot), are two of these enterprises. The facts set forth below in this Opinion are taken from the allegations of the First Amended Complaint. For purposes of deciding the

pending Motions, the Court must take these facts as true.

The circumstances that eventually led to the fraudulent scheme began in 1990. At that time, Defendants Randolph Martin, M.D. and Donald Mallette, founded a company called Capital Aircraft. Capital Aircraft initially sold aircraft parts. Capital Aircraft later began selling aircraft and brokering aircraft. Starting in 1998, Capital Aircraft started setting up separate limited liability companies (Capital Aircraft LLCs). Each Capital Aircraft LLC purchased either aircraft or aircraft engines and leased them to airlines located in South Africa and South America. Capital Aircraft and Capital Aircraft LLCs borrowed funds to finance the purchase of the aircraft and engines that were then leased. Defendants Chrans, Bentley and BBS provided management and accounting services for Capital Aircraft and the related Capital Aircraft LLCs. Dr. Martin used his connections in the Springfield, Illinois, medical community to solicit other doctors to invest in the Capital Aircraft LLCs. The Individual Plaintiffs did not invest in any of the Capital Aircraft LLCs.

In 1995, Defendant Fayez Chehab began operating an enterprise called American Falcon, S. A. (AMFAL). He incorporated AMFAL in Argentina in 1997. AMFAL provided charter airline services in Argentina.

AMFAL operated a Fokker F-28-1000 aircraft leased from Capital Aircraft. In early 2000, AMFAL was a failing enterprise.  If AMFAL failed, then Capital Aircraft would not receive its lease payments, and it in turn would default on the loan secured by the Fokker F-28-1000 aircraft.  To stave off AMFAL's insolvency, Chehab, Chrans, Bentley, Mallette, and Martin developed a fraudulent scheme to lure unsophisticated investors into investing in AMFAL.  Chehab agreed to give Chrans, Bentley, Mallette, and Martin stock in AMFAL in exchange for their participation in the fraudulent scheme.

Chrans, Bentley, Mallette and Martin recruited unsophisticated investors, including the Individual Plaintiffs into their scheme.  Chehab, Chrans, Bentley, Mallette, and Martin made a series of written and oral presentations to the Individual Plaintiffs and other prospective investors. These presentations allegedly contained material misrepresentations and omissions of fact designed to deceive the prospective investors about the nature of AMFAL's financial condition and the nature of the proposed investment.

As part of the scheme, Chehab, Chrans, Bentley, Mallette, and Martin offered ten subscriptions for membership interests in a limited liability

company called American Falcon Investment Company, LLC (AMFAL Investment). The investors would not pay cash for the membership interests; rather, each investor would sign a $300,000.00 personal guarantee, guaranteeing ten percent of a $3 million loan from the Bank to AMFAL Investment. AMFAL Investment, in turn, would purchase 33.33% of the stock of AMFAL for $2.2 million. AMFAL would use the $2.2 million to acquire new aircraft and expand its operations. AMFAL Investment would retain $800,000.00 to pay debt service during 2000. Thereafter, according to Chehab, Chrans, Bentley, Mallette, and Martin, AMFAL would generate sufficient income to service the debt and provide significant profits.

In May 2000, each of the three married Individual Plaintiff Couples, the Barons, Mallavarapus, and Trasks, purchased one of the ten subscriptions in AMFAL Investment. The Individual Plaintiffs were unsophisticated investors. They allegedly relied on the Defendants' material misrepresentations and omissions to make these investments. The Individual Plaintiffs also relied on their familiarity with Dr. Martin and their awareness of other physicians in the Springfield community who had invested in the Capital Aircraft LLCs. Each Individual Plaintiff signed a

personal guarantee.

Almost immediately, the Defendants allegedly deviated from the representations made to investors.  The Defendants sold 14 memberships interests in AMFAL Investment, instead of 10.   AMFAL Investment borrowed $4.2 million from the Bank, instead of $3 million.   AMFAL Investment acquired 47% of AMFAL, instead of 33.33%.  The written guarantee documents did not contain a $300,000.00 limit on the guarantee.  According to the documents, each of the Individual Plaintiffs personally guaranteed the full $4.2 million loan.  AMFAL Investment paid $3.1 million to AMFAL instead of $2.2 million.  AMFAL used a substantial portion of these funds to pay old debts rather than investing in expansion of the business.  AMFAL Investment did not use the remaining $1.1 million from the loan for debt service.  Rather, the money was distributed to AMFAL in November 2000.   AMFAL did not issue stock to AMFAL Investment.  Rather, after a significant delay, AMFAL issued stock directly to investors, including the Individual Plaintiffs.

Some time after May 2000, the Bank made a separate, sham $3 million loan to AMFAL.  The loan appeared on the books of AMFAL, but the funds were placed in a certificate of deposit that never left the Bank's

possession.  The loan gave the false impression that AMFAL had $3 million in additional working capital.

In November 2000, Chehab and Chrans told the Individual Plaintiffs and other investors that AMFAL needed additional funds to complete negotiations on a deal with Air France.  These representations were false. Based on these misrepresentations, each of the Individual Plaintiff Couples paid $85,750.00 for a promissory note from AMFAL Investment.  AMFAL Investment never repaid anything on these three notes.  The Plaintiffs have no knowledge of how these funds were used.

On February 22, 2001, the Individual Plaintiffs were told that AMFAL had signed contracts for charter services that would generate $9 million to $13 million in revenues.  This was false.  In April 5, 2001, at a meeting of shareholders, the Individual Plaintiffs and other investors were told that AMFAL needed an additional $3 million in capital.  In May 2001, there was a recapitalization in which each of the three Individual Plaintiff Couples invested an additional $300,000.00 in cash in AMFAL.  They made these investments because of the continuing misrepresentations made by Chehab and Chrans.

In July 2001, AMFAL Investment was unable to make the monthly

loan payment to the Bank. The investors in AMFAL Investment put up funds to cover the payment. Each Individual Plaintiff Couple paid $6,380.00 toward covering the payment.

In August 2001, the Bank called the $300,000.00 guarantees for the original AMFAL Investment loan. The Individual Plaintiffs converted the outstanding guarantee obligations into three personal loans, one for each couple. The principal amount of each loan was $248,510.00, and each loan was evidenced by a promissory note to the Bank. The Bank, in turn, released the Individual Plaintiffs from their AMFAL Investment guarantees. At this time, Defendant McGlasson was Executive Vice President of the Bank. He informed the Individual Plaintiffs that Capital Aircraft was in financial difficulty and would not be able to provide aircraft to AMFAL.

In April and May 2001, Chrans and Chehab recruited the Individual Plaintiffs to invest in a new venture to acquire a Boeing 737 aircraft to lease to AMFAL because Capital Aircraft was not going to be able to lease aircraft. On October 9, 2001, Chehab and Chrans formed ROTFL for the purpose of acquiring the Boeing 737 to lease to AMFAL. McGlasson told the Individual Plaintiffs that investing in an airplane was like investing in a house because the plane provided collateral to pay the loan in the event of

default.  The Individual Plaintiffs relied on McGlasson's representations in entering into this investment.

The ROTFL investment was structured similarly to the original investment in AMFAL Investment.  The investors, including the Individual Plaintiffs, provided personal guarantees of $1.05 million each, to secure a $4.05 million loan to ROTFL, to purchase the Boeing 737.  Each guarantee was later reduced to $840,000.00.  In exchange, the investors, including the Individual Plaintiffs, received interests in ROTFL.  The loan proceeds were used to acquire a Boeing 737 aircraft for a purchase price of $4 million.  The price grossly exceeded the fair market value of the plane.  Chehab and Chrans also negotiated a $400,000.00 "rebate" from the seller.  The "rebate" did not go to ROTFL; rather, Chrans and Chehab diverted the funds to their own use.

On December 12, 2001, Chehab sent AMFAL investors an email saying that AMFAL, again, needed additional capital.  In January 2002, AMFAL had a second recapitalization in which the Mallavarapus and the Trasks, as married couples, each invested $121,216.00 in cash in AMFAL.

In March 2002, Chehab sent emails to AMFAL Investment investors in which he continued to paint a rosy picture of the viability of AMFAL and

to ask for additional loans to finance receivables.  In April 2002, the Barons and the Mallavarapus, as married couples, each loaned $75,000.00 to AMFAL.

In September 2002, Chehab and Chrans requested additional capital from investors, including the Individual Plaintiffs.  Chrans made misrepresentations to induce the Individual Plaintiffs to participate in the recapitalization.  In September 2002, the Individual Plaintiffs invested a total of $655,000.00 in the third recapitalization of AMFAL.

Capital Aircraft went out of business in November 2002.  Chehab and Chrans encouraged investors to buy a Boeing 737 from Capital Aircraft to lease to AMFAL.  They also advised the Individual Plaintiffs to buy the Fokker F-28-1000 that Capital Aircraft had been leasing to AMFAL.  McGlasson also encouraged the Plaintiffs to participate in these transactions.  He said that the purchases were good investments that would assist AMFAL in realizing profits.

On January 24, 2003, Chehab and Chrans formed Plaintiff Alpha Foxtrot for the purpose of acquiring the Boeing 737 from Capital Aircraft.  The Individual Plaintiffs, and other investors, each provided guarantees of $250,000.00 to secure a loan to Alpha Foxtrot from the Bank.  The

Individual Plaintiffs received interests in Alpha Foxtrot in exchange for their guarantees. The Bank loaned Alpha Foxtrot $2 million to purchase the Boeing 737. The purchase price was $1.7 million. The Individual Plaintiffs do not know what Chehab and Chrans did with the remaining $300,000.00. The price greatly exceeded the market value of the plane. The Bank never perfected a security interest in the plane. Instead, Chehab ultimately used the plane as collateral for a personal loan, discussed below. The plane was leased to AMFAL.

In 2003, Chehab and Chrans formed an Argentinian corporation called Falcon Air, S.A. (Falcon Air). Falcon Air purchased the Fokker F-28-1000 plane used by AMFAL. Falcon Air borrowed $3.7 million from the Bank to finance the purchase. The Barons and the Mallavarapus extended their personal guarantees of the ROTFL and Alpha Foxtrot loans to guarantee this loan also. The Barons and the Mallavarapus were to receive interests in Falcon Air in exchange for the extension of their guarantees. Chehab and Chrans, however, kept all of the ownership interests in Falcon Air for themselves, excluding the Barons and the Mallavarapus. The proceeds from the loan were used to pay the $2.7 million purchase price for the plane. Chehab and Chrans diverted the remaining $1 million to pay

undisclosed obligations of AMFAL and for their personal use.  The Bank

again took no action to perfect a security interest in the plane.  Chehab was

also able to use this plane later as collateral for a personal loan.

On May 16, 2004, the Bank loaned an additional $410,000.00 to

Falcon Air, purportedly to purchase a new jet engine.  The Barons and the

Mallavarapus provided guarantees for this loan.

Throughout this time, Chehab, Chrans and Bank officer Defendants

McGlasson and Kelley regularly asked the Individual Plaintiffs to provide

the additional cash to meet the immediate needs of AMFAL, ROTFL, Alpha

Foxtrot, and Falcon Air (collectively the Enterprises), including making

monthly payments on loans to the Bank.  The Bank did not make a demand

under the personal guarantees, and so, the Individual Plaintiffs were not

obligated to make these payments.  Bank representatives, particularly

Kelley, misrepresented to the Individual Plaintiffs that they were obligated

to make these contributions to keep the Enterprises operating.  The Bank

did not credit the payments against the dollar limits on the guarantees.

In March and April 2004, Chehab halted all of AMFAL's scheduled

operations.  Chehab advised the Individual Plaintiffs that he was negotiating

the sale of AMFAL to a Chilean airline called Lan Chile.  Chehab asked the

Individual Plaintiffs to send him their AMFAL stock certificates to complete the transaction.  Chehab told the Individual Plaintiffs that Lan Chile had agreed to make a short-term loan to AMFAL to be secured by the stock certificates.  The Individual Plaintiffs sent Chehab the stock certificates.

In July 2004, Chehab told the Individual Plaintiffs that the deal with Lan Chile had fallen through.  He subsequently negotiated a personal loan from a lending unit of Aerolineas Argentina in the amount of approximately $2 million.  He used the stock certificates, the Boeing 737 owned by Alpha Foxtrot, and the Fokker F-28-1000 owned by Falcon Air as collateral for the loan.  Aerolineas Argentina secured liens on the two aircraft that had priority over the Bank's unperfected security interests.  Chehab later canceled all of the Individual Plaintiffs' shares in AMFAL.

Also in July 2004, Chehab and Chrans caused AMFAL, ROTFL and Alpha Foxtrot to execute four documents called Loan Sale Agreements.  Under the terms of these Loan Sale Agreements, ROTFL and Alpha Foxtrot "sold" to Chehab all the obligations owed to them by AMFAL.  The total purchase price was $40.00.  The obligations that Chehab "purchased" for $40.00 exceeded $5 million.  As of May 31, 2005, AMFAL owed ROTFL $4,729,320.00, and owed Alpha Foxtrot $1,693,160.00.

In September 2004, the Bank and the other Defendants consolidated the Bank's outstanding loans to the Enterprises.  AMFAL defaulted on the payments on the consolidated loans in November and December 2004. Each Individual Plaintiff Couple paid approximately $26,666.00 toward these two payment obligations.   AMFAL continued to default on the payments thereafter for the first six months in 2005.  Defendant Kelley contacted Dr. Baron and Dr. Trask on behalf of the Bank to persuade them to make payments on the loans.  They refused.

In January 2005, Chehab represented to Dr. Mallavarapu that there was an opportunity to purchase Skyways, S.A. (Skyways), an Argentinian charter airline from which AMFAL leased an airplane.  The deal also involved purchasing a second airplane referred to as the "Ryan" airplane. Dr. Mallavarapu sent Chehab $735,000.00 to fund the purchase of Skyways and the Ryan airplane.  On April 14, 2005, Dr. Mallavarapu loaned an additional $200,000.00 to Chehab to complete the transaction.   The Skyways and Ryan transactions were never completed, and Dr. Mallavarapu never received any money back.

In February 2005, Chehab sent an email to the Individual Plaintiffs informing them that AMFAL could not generate enough money to pay all

14

its obligations and proposed an interest-only arrangement with the Bank for six months.  In May 2005, the Bank entered into a Modification of Loan Consolidation and Forbearance Agreement (Modification Agreement) with the Enterprises, the Individual Plaintiffs, Chehab, and Chrans.   The Modification Agreement provided for interest-only payments through October 5, 2005, and for the parties' best efforts to remove the prior liens on the Alpha Foxtrot and Falcon Air planes.  In conjunction with the Modification Agreement, the Individual Plaintiffs were required to execute agreements in which they reaffirmed their prior outstanding guarantees.

On May 30 2005, AMFAL filed the equivalent of Chapter 11 bankruptcy in Argentina.  Chehab never advised the Individual Plaintiffs in advance that AMFAL was planning to file bankruptcy, and did not seek their vote or input as shareholders regarding the bankruptcy.   The Individual Plaintiffs were not allowed to participate in shareholder meetings regarding the bankruptcy because they did not have their shares in AMFAL.

On June 29, 2005, the Bank loaned Chehab $150,000.00.  To secure the loan, Chrans signed guarantees on behalf of ROTFL and Alpha Foxtrot guaranteeing all of Chehab's debts to the Bank. Chrans then resigned as the manager of ROTFL and Alpha Foxtrot.  The Bank applied $125,183.12 to

15

pay interest and the remaining $24,816.88 to reduce the principal of the ROTFL, Alpha Foxtrot, and Falcon Air's loans to the Bank.

Plaintiffs discovered the fraud in 2005 when they engaged a third party, EM Capital and EM Management, to take over the management of ROTFL and Alpha Foxtrot.  After discovering the fraud, the Plaintiffs brought this action.

## ANALYSIS

The Amended Complaint has 22 Counts.  Count I alleges securities fraud in violation of § 10 of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.  15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. Counts II, III, IV, and V allege RICO violations based on predicate acts of mail fraud, wire fraud, and bank fraud committed by Defendants.   18 U.S.C. §§ 1341,1343,1344, 1962, & 1964.  The remaining Counts allege state law claims against one or more of the Defendants, including conversion (Count XVII) and unjust enrichment (Count XIV and XV).  The Moving Defendants ask the Court to dismiss the RICO claims, the unjust enrichment claim in Count XV, and the conversion claims.[1]

---

[1]The unjust enrichment claim in Count XIV is only against Chehab.  He has not filed a motion to dismiss this claim.

For purposes of these Motions, the Court must accept as true all well-pleaded factual allegations contained in the Amended Complaint and draw all inferences in the light most favorable to the non-moving party.  Hager v. City of West Peoria, 84 F.3d 865, 868-69 (7th Cir.1996); Covington Court, Ltd. v. Village of Oak Brook, 77 F.3d 177, 178 (7th Cir.1996).   The Amended Complaint should not be dismissed unless it appears beyond doubt that the Plaintiffs can prove no set of facts that would entitle them to relief.  Doherty v. City of Chicago, 75 F.3d 318, 322 (7th Cir.1996).  As explained below, the Court agrees with the Moving Defendants that the Plaintiffs have failed to state claims for relief under RICO, or under state law theories of unjust enrichment and conversion.

A.   RICO

In 1995, Congress amended RICO to bar private RICO causes of action based on allegations that would be actionable as fraud in the purchase or sale of securities, unless the defendants have already been convicted of securities fraud.  18 U.S.C. § 1964(c).  Congress enacted § 1964(c):

> "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent a plaintiff from "plead[ing] other specified offenses, such as mail fraud or wire fraud, as

17

predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud."

Bald Eagle Area School Dist. v. Keystone Financial, Inc., 189 F.3d 321, 327 (3rd Cir. 1999) (quoting H.R. Conf. Rep. No. 104-369 at 47 (1995)). Congress's goal was, "'completely eliminating the so-called "treble damage blunderbuss of RICO" in securities fraud cases.'" Id. at 328 (quoting 141 Cong. Rec. H2771). The Plaintiffs do not allege that any of the Defendants have been convicted of securities fraud. Thus, the RICO Counts fail to state claims if the conduct pled as the predicate acts is actionable as securities fraud. Id. at 330. That is exactly what the Plaintiffs are trying to do here.

The Plaintiffs' securities fraud claim requires proof, inter alia, that the Defendants made misrepresentations or omissions that induced the Plaintiffs to participate in the purchase or sale of securities. Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648 (7th Cir. 1997). The Plaintiff's RICO claims require proof that the Defendants conducted an enterprise through a pattern of racketeering. Mira v. Nuclear Measurements Corp., 107 F.3d 466, 473 (7th Cir. 1997). A pattern of racketeering requires proof that the Defendants engaged in two or more specific predicate criminal acts. Id. The Plaintiffs allege that the Defendants engaged in the

18

predicate criminal acts of mail fraud, wire fraud, and bank fraud.  Amended Complaint, ¶ 231.  Each of these predicate criminal acts requires proof that the Defendants participated in a scheme to defraud.  Corley v. Rosewood Care Center, Inc. of Peoria, 388 F.3d 990, 1005 (7th Cir. 2004) (mail fraud); U.S. v. Yoon, 128 F.3d 515, 522 (7th Cir. 1997) (bank fraud); U.S. v. Brandon, 50 F.3d 464, 467 (7th Cir. 1995) (wire fraud).  In RICO cases, the allegations of a scheme to defraud must be pled with particularity.  Fed. R. Civ. P. 9(b); Vicom, Inc. v. Harbridge Merchant Services, Inc., 20 F.3d 771, 777 (7th Cir. 1994).

The Plaintiffs allege the same misrepresentations to establish both the securities fraud claim in Count I and the scheme to defraud necessary to establish the predicate acts, and so the pattern of racketeering, for the RICO claims in Counts II-V.  Count I of the Amended Complaint alleges 32 specific misrepresentations that were made by the various Defendants to induce the Individual Plaintiffs to engage in securities transactions.  Amended Complaint, ¶ 216(a)-(af).  The Plaintiffs further allege that the Individual Plaintiffs would not have made any of the investments, executed any of the guarantees, loaned any of the money, or made any of the payments to the Bank or others, but for these 32 misrepresentations.  Id. ¶

218.  Counts II-V incorporate by reference 18 of these misrepresentations, and allege that these same misrepresentations were part of the predicate acts of mail fraud, wire fraud, and bank fraud that form the basis of the RICO claims.  Id., ¶¶ 229, 246, 253, 261.  The RICO claims are thus dependent on conduct that is actionable as securities fraud.  Since the conduct is actionable as securities fraud, the conduct cannot be a basis for a RICO claim.  18 U.S.C. § 1964(c); Bald Eagle School Dist., 189 F.3d at 330.  The Plaintiffs, therefore, fail to state a RICO claim.

The Plaintiffs argue that some of the Defendants' wrongful conduct might not be actionable as securities fraud, and the RICO Counts should survive a motion to dismiss because of that possibility.  The Plaintiffs argue, for example, that the Defendants fraudulently induced the Individual Plaintiffs to make numerous payments to the Bank on the Enterprises' outstanding loans over the course of the scheme.  They argue that those payments were not made in connection with a securities transaction and so are not actionable as securities fraud.

The Plaintiffs effectively ask the Court to parse their claim to identify parts that might be separable from the securities fraud.  The courts have rejected this approach.  Bald Eagle School Dist., 189 F.3d at 329-30;

Stephenson v. Deutsche Bank AG, 282 F.Supp.2d 1032, 1071-72 n. 27 (D. Minn. 2003); Fezzani v. Bear, Stearns & Co., Inc., 2005 WL 500377, *4 (S.D.N.Y. 2005).  Congress sought to eliminate RICO claims in securities fraud cases.  The careful parsing of the Amended Complaint would frustrate that Congressional goal.  Bald Eagle School Dist., 189 F.3d at 329-30.

The Plaintiffs also argue that some of the Defendants engaged in mail fraud, wire fraud and bank fraud to aid and abet the securities fraud, and a private cause of action cannot be brought for aiding and abetting securities fraud.  Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 176 (1994).  Since aiding and abetting is not actionable as securities fraud, Plaintiffs argue that the Court should allow the RICO claims against these Defendants to proceed.  One district court has accepted this argument.  OSRecovery, Inc. v. One Groupe International, Inc., 354 F.Supp.2d 357, 368-70 (S.D.N.Y. 2005).

This Court is not persuaded by the decision in OSRecovery, Inc.  First, aiding and abetting securities fraud is actionable under the Securities and Exchange Act.  After the Supreme Court decision in Central Bank of Denver, Congress amended the Securities and Exchange Act to authorize the Securities and Exchange Commission to bring actions against defendants

who aid and abet securities fraud.  15 U.S.C. § 78t(e).  Thus, aiding and abetting securities fraud is actionable under the securities laws, and so cannot be the basis of a RICO claim.  The OSRecovery, Inc.  Court did not address the impact of § 78t(e) on its analysis.[2]

In addition, any possible wrongful conduct that is not actionable as securities fraud (such as aiding and abetting the securities fraud or fraudulently inducing the Individual Plaintiffs to make payments to the Bank on the Enterprises' outstanding loans) is only actionable under RICO if the wrongful conduct was part of a pattern of racketeering.  Mira, 107 F.3d at 473.  The OSRecovery, Inc. Court did not address whether the plaintiffs in that case alleged a pattern of racketeering that was not based on conduct that was actionable as securities fraud.  In this case, however, the Plaintiffs allege a pattern of racketeering activity consisting of mail fraud, wire fraud, and bank fraud.  Such fraud must be pled with particularity. Vicom, Inc., 20 F.3d at 777; Fed. R. Civ. P. 9(b).  The Plaintiffs alleged 18

---

[2]It is true that the Plaintiffs cannot bring a private cause of action for aiding and abetting securities fraud, but the bar to RICO claims is based on whether the conduct is actionable as securities fraud, not whether a particular plaintiff could bring the action. A number of courts have barred RICO claims because someone other than the plaintiff in the particular case could bring a securities fraud claim based on the same conduct. E.g., Howard v. America OnLine Inc., 208 F.3d 741, 749 (9th Cir. 2000); Florida Evergreen Foliage v. E.I. DuPont De Nemours and Co., 165 F.Supp.2d 1345, 1356-58 (S.D.Fla. 2001).

specific misrepresentations that formed the basis of the mail fraud, wire fraud, and bank fraud that constituted the predicate acts necessary to allege the pattern of racketeering activity here. Amended Complaint, ¶¶ 229, 246, 253, 261. Those misrepresentations were also made to induce the Individual Plaintiffs to purchase securities. Id., ¶¶ 216-18, 222. Thus, the alleged pattern of racketeering essential to any of the Plaintiffs' RICO claims requires proof of conduct that is actionable as securities fraud. The Plaintiffs cannot pursue RICO claims based on this conduct. 18 U.S.C. § 1964(c). The Plaintiffs, therefore, fail to state a RICO claim. The RICO claims are dismissed against the Moving Defendants.

B.   Unjust Enrichment

Count XV alleges that the Bank was unjustly enriched by payments made by the Individual Plaintiffs on the Bank's loans to the various enterprises, and by the notes and guarantees executed by them. The Plaintiffs seek disgorgement of the payments and recision of the Plaintiffs' outstanding obligations to the Bank.

The Plaintiffs' unjust enrichment claim is based on a theory of quasi-contract, or contract implied in law. Consolidated Response to Defendants' Motions to Dismiss Counts XV and XVII of the First Amended Complaint

(d/e 57) at 7; see Hanley v. Trendway Corp., 1995 WL 103748, *3 (N.D.

Ill. 1995).  A contract implied in law, or a quasi-contract, can be found

when one party provides a benefit to another under circumstances in which

it would be inequitable or unjust to allow the benefitted party to retain the

benefit without compensating the other party.  Industrial Lift Truck Service

Corp. v. Mitsubishi International Corp., 104 Ill.App.3d 357, 432 N.E.2d

999, 1002 (1982).  This theory of recovery, however, is only available if the

parties have no contract governing their relationship.  Id.  Here, the parties

executed numerous contracts to govern their relationship.  The Individual

Plaintiffs executed personal guarantees, promissory notes, the Modification

Agreement, and other agreements to govern their obligations to the Bank.

The Enterprises executed notes and other documents to govern their

obligations to the Bank.  The Individual Plaintiffs made payments on debts

governed by these documents.  Because the relationship between the parties

was governed by these agreements, there is no basis for recovery under an

unjust enrichment or quasi-contract theory.

The Plaintiffs argue that the Bank coerced the Individual Plaintiffs to

make payments that were not governed by any of these agreements.  They

argue that the Bank regularly coerced them into making payments on the

Enterprises' obligations that the Individual Plaintiffs were not contractually obligated to make.  The Bank, however, was receiving funds owed pursuant to the notes and other agreements with the Enterprises, and the Individual Plaintiffs had an equity interest in the Enterprises and had guaranteed some, if not all, of those debts.  These payments, thus, were directly connected to the overall contractual relationships between these parties.  In such situations, quasi-contract or unjust enrichment recovery is not available.  See Industrial Lift Truck Service Corp., 432 N.E.2d at 1003.  In addition, these payments did not unjustly enrich the Bank because the amounts paid to the Bank were owed to it by the Enterprises.  Count XV fails to state a claim.

C.   Conversion

Count XVII alleges conversion of all the funds paid by the Individual Plaintiffs to the Defendants.[3]  To state a claim for conversion, the Plaintiffs must allege that: (1) the Defendants have taken wrongful control of their personal property, (2) the Plaintiffs have a right to the property, (3) the Plaintiffs' right to possession is immediate and absolute, and (4) the

---

[3]Count XVII does not assert a claim for conversion of any other property, such as the AMFAL stock certificates delivered to Chehab.  Count XVII also does not assert a claim by ROTFL or Alpha Foxtrot for conversion of any funds owned by either entity.

Plaintiffs demand possession of the property.  <u>Roderick Dev. Inv. Co. v. Community Bank of Edgewater</u>, 282 Ill.App.3d 1052, 668 N.E.2d 1129, 1133 (1996).  Conversion will not lie for money, however, unless the funds are specifically identifiable.  <u>Id.</u> at 1134.  The funds have been found to be specifically identifiable in Illinois in situations where: (1) a third party transfers the funds to the defendant with the understanding that the defendant will transfer the funds to the plaintiff, but the defendant wrongfully retains the funds; or (2) the plaintiff transfers the funds to the defendant for a limited purpose, but the defendant wrongfully retains the funds.  <u>E.g.</u>, <u>Addante v. Pompilio</u>, 303 Ill.App. 172, 25 N.E.2d 123 (1940); <u>Grand Pacific Hotel Co. v. Rowland</u>, 88 Ill.App. 519 (1899).  A general debt or sum owed on account, however, is not identifiable and will not support a claim for conversion.  <u>In re Thebus</u>, 108 Ill.2d 255, 483 N.E.2d 1258, 1260 (1985).

Conversion also will not lie when the plaintiff voluntarily transfers the funds to the defendant as part of a transaction between the two parties. <u>Roderick</u>, 668 N.E.2d at 1135.  In such situations, a plaintiff has voluntarily and intentionally relinquished ownership of the funds as part of the transaction.  Since the plaintiff has given up ownership, and thus, the right

26

to possession of the funds, conversion will not lie.  The plaintiff may have a claim in tort or contract for damages, but not a claim for conversion. Roderick, 668 N.E.2d at 1133; General Motors Corp. v. Douglass, 206 Ill.App.3d 881, 565 N.E.2d 93, 97 (1990).

In this case, the Individual Plaintiffs paid debts owed to the Bank, purchased investments, and loaned money to the Enterprises and one or more of the Defendants.  In each case, they intentionally relinquished ownership and control of the funds as part of the transactions.  Since the Individual Plaintiffs gave up their right to ownership and possession of the funds, there was no conversion.  General Motors Corp., 565 N.E.2d at 97. The Individual Plaintiffs may recover from these Defendants if they prevail on one or more of the remaining theories alleged in the Amended Complaint, but they cannot state a claim for conversion.

THEREFORE, Bank of Springfield's Motion to Dismiss Counts II, III and V of First Amended Complaint Pursuant to Rule 12(b)(6) (d/e 43), Bank of Springfield's Motion to Dismiss Count XV-Unjust Enrichment (d/e 45), Bank of Springfield's Motion to Dismiss Count XVII-Conversion (d/e 47), Motion to Dismiss Counts II, III, IV and V of the First Amended Complaint (d/e 49), Motion to Dismiss Count XVII of the First Amended

Complaint (d/e 50), Motion to Dismiss Counts II, III, IV and V of the First Amended Complaint (d/e 51), and Motion to Dismiss Count XVII of the First Amended Complaint (d/e 53) are ALLOWED.  Count XV is dismissed. The claims alleged against Defendants Bank of Springfield, Michael McGlasson, James Kelley, William Chrans, Stephen K. Bentley, and Better Business Systems of Montana, Inc. in Counts II-V, and XVII are dismissed. IT IS THEREFORE SO ORDERED.

ENTER:   January 19, 2006.

   FOR THE COURT:

      <u>  s/  Jeanne E. Scott   </u>
       JEANNE E. SCOTT
      UNITED STATES DISTRICT JUDGE