E-FILED
Monday, 21 July, 2008  03:12:29 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| THOMAS E. BARON, LINDA S. BARON, CHRISTOPHER T. MALLAVARAPU, JANET K. MALLAVARAPU, ROBERT V. TRASK, MARY L. TRASK, ROTFL, LLC, a Nevada limited liability company, and ALPHA FOXTROT, LLC, a Nevada limited liability company, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )   No. 05-3240 |
| | ) |
| WILLIS CHRANS, STEVEN K. BENTLEY, REAL ESTATE SYSTEMS OF GILLETTE, INC. d/b/a Better Business Systems, BANK OF SPRINGFIELD, an Illinois banking corporation, MICHAEL McGLASSON, and JAMES KELLEY, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on the Defendants' Motions for

Summary Judgment (d/e 141, 142, 143, 144, and 145).  For the reasons set

forth below, the Motions for Summary Judgment filed by Defendants Steven K. Bentley, and Real Estate Systems of Gillette, Inc. (RES), are ALLOWED, and the Motion for Summary judgment filed by Defendant Willis Chrans is ALLOWED in part and DENIED in part.  The Motions for Summary Judgment filed by Defendants Bank of Springfield, McGlasson and Kelley are denied as moot because these parties have entered into a binding settlement agreement.

## STATEMENT OF FACTS

In 1997, Randall Martin and Donald Mallette owned a company called Capital Aircraft, Inc. (Capital).[1]  Capital was located in Springfield, Illinois, and it leased commercial aircraft and aircraft engines to foreign airlines.  In 1997, Capital hired Defendant RES to perform professional management services for Capital.  Defendants Willis Chrans and Steven Bentley were the principles of RES.  Under the Management Agreement, Chrans became Capital's chief operating officer and Bentley became the chief financial officer.  Bank of Springfield's Motion for Summary Judgment (d/e 141) (Bank Motion), Statement of Undisputed Fact (Bank SUF) ¶¶ 28-

---

[1]Martin, Mallette, and Fayez Chehab were originally named as Defendants in this case.  The claims against them have been dismissed.  Opinion entered May 11, 2006 (d/e 94); Text Order entered January 3, 2008.

31.[2]

In 1997, Capital formed an affiliated limited liability company called Capital Airline Leasing Company Three, LLC (Cap III).  Cap III acquired a Fokker-28-1000 airplane (F-28).  Capital Aircraft Holding Company LLC (Capital Holding) owned 87.5 percent of Cap III and an investor named Jeremy Michaels owned the remaining 12.5 percent.  Capital Holding was owned by Mallette and Martin.  Bank SUF ¶¶ 32-34.

Cap III tried to lease the F-28 unsuccessfully to an Argentinian airline called Aerogaucho.  The president of Aerogaucho told Mallette that another Argentinian airline called American Falcon, S.A. (American Falcon), was interested in leasing the F-28.  At this point in time, American Falcon only flew charter flights using aircraft leased on an hourly basis from a civilian arm of the Argentinian military.   American Falcon's principal, Fayez Chehab, was interested in acquiring planes and starting regular commercial service in Argentina.  Bank SUF ¶¶ 35-37.

In July 1998, Defendant Bank loaned $2,500,000.00 to Cap III to

---

[2]The Court refers to Statements of Undisputed Facts in the various Memoranda that were not disputed by the opposing party.  See Local Rule 7.1(D).  Some of the undisputed facts come from Memoranda of those who have settled, but the facts are used to provide context for the involved fact pattern here.

refinance the F-28.  The loan was guaranteed by Mallette, Martin, Jeremy Michaels, William Pyle (a Springfield physician), and Capital.  Each guarantee was limited to $650,000.00.  In November 1998, Cap III leased the F-28 to American Falcon.  In July 1999, the Bank refinanced the loan on the F-28 with the same guarantors.  Bank SUF ¶¶ 40-43.

In August 1999, Chehab came to Springfield to look at two McDonnell-Douglas DC-9 planes owned by Capital (DC-9s).  He wanted to lease those planes to put them into service with American Falcon.  Bank SUF ¶ 45.

Chehab also offered Capital's principles the opportunity to buy American Falcon stock.  In November 1999, Martin, Mallette, Chrans, Bentley, and three other individuals associated with Capital, Steve Young, Jeff Shaw, and Jeremy Michaels (Capital Group) formed the Capital Airline Investment LLC.  Capital Airline Investment LLC purchased 460,000 shares of American Falcon from Chehab for a stated purchase price of $1,500,000.00.  The Capital Group, collectively, paid $500,000.00 at the time of the purchase.  The Capital Group agreed to pay the rest of the purchase price over time, however, the Capital Group never paid any more for the stock.  Defendants did not disclose the terms of this stock

4

acquisition to the Plaintiffs.  <u>Bank SUF</u> ¶¶ 47-49; <u>Plaintiffs' Response to</u> <u>Chrans Motion for Summary Judgment (d/e 149)</u>, <u>Statement of Additional</u> <u>Undisputed Facts (Plaintiffs' Response to Chrans SUF)</u> ¶ 43.

In addition, Capital Airline Investment LLC also agreed to broker a sale of 280,000 of Chehab's shares of American Falcon to an investor group by July 15, 2000, for $3,000,080.00.  Chehab would contribute $2,200,000.00 of the purchase price to American Falcon and loan $440,000.00 of the purchase price to the buying investment group.  <u>Bank</u> <u>SUF</u> ¶ 47.

On February 7, 2000, Chehab sent Chrans, Bentley, and RES an email in which he recommended that American Falcon stop operating on February 15, 2000, and to forget about regular flights altogether.  Chehab complained about the high cost of operating the F-28.  In March 2000, Chehab met with Chrans in Miami to discuss the financial condition of the company. Chehab presented three options: raise sufficient funds to finance the projected deficit; try to sell American Falcon; or close the company as soon as possible to avoid further losses.  In March 2000, Chehab told Chrans that he would put the company into bankruptcy on May 1, 2000, if they could not provide any assistance.  <u>Plaintiffs' Response to Chrans SUF</u> ¶¶ 22-24.

In April 2000, Mallette and Bentley asked the Bank for $200,000.00 in additional credit to perform the maintenance on the F-28 and to rebuild its engines.  Bank SUF ¶ 50; Plaintiffs' Response to Chrans SUF ¶ 25.

In Spring 2000, Chrans, Bentley, and RES prepared and distributed a document called a Private Placement Offering (PPO) to prospective investors to offer an opportunity to invest in American Falcon.  Chrans Motion for Summary Judgment (d/e 143) (Chrans Motion), Exhibit 12, PPO.  Chrans and Bentley also distributed a copy of a Power Point presentation of the investment opportunity.  Id., Exhibit 13, Power Point Presentation (Power Point) (the Power Point and PPO are collectively referred to as the Offering Documents).

The Offering Documents explained that American Falcon was a start-up airline in Argentina.  American Falcon leased one airplane, the F-28, and also rented other planes on an hourly basis.  American Falcon planned to lease additional planes, expand its charter business, and start regularly scheduled air service in South America.  The Offering Documents explained that the F-28 was not currently flying because of a required maintenance check.  The proposal contained projections that estimated that American Falcon would start producing positive net income in August 2000, and

would have a net income in 2001 of over $5,000,000.00.  By 2004, the PPO projected that American Falcon would have an annual net income of more than $11,800,000.00.

The Offering Documents sought ten investors.  Under the proposal, a new limited liability company called American Falcon Investment Company, LLC (AMFAL Investment) would be formed.  The Bank would lend AMFAL Investment $3,000,000.00.  AMFAL Investment would use $2,200,000.00 to buy 33.3 percent of American Falcon stock.  AMFAL Investment would use $521,818.00 for debt service until American Falcon started to generate enough positive cash flow to service the debt.  The remaining $278,182.00 would be held in reserve.  The PPO projected that American Falcon would start servicing the debt in March 2001.  The ten prospective investors would sign personal guarantees of $300,000.00 each to guarantee the Bank's loan to AMFAL Investment, but put up no cash. In exchange, each investor would receive a ten percent interest in AMFAL Investment (and, through AMFAL Investment, a 3.33 percent ownership interest in American Falcon).  <u>Bank SUF</u> ¶ 59.  The Offering Documents disclosed that Chehab would own 33.3 percent of American Falcon, and the Capital Group would own the remaining 33.3 percent.

The PPO also contained an Addendum that stated that the investors in AMFAL Investment would be given the opportunity to invest in the airplanes that American Falcon planned on acquiring. The proposal explained that the investors would form new limited liability companies to own the planes, and then lease the planes to American Falcon. It was anticipated that four planes would be acquired and leased to American Falcon. Bank SUF ¶ 60; Second Amended Complaint (d/e 101), Exhibit 3, Addendum to Investment Opportunity In American Falcon Involving Airplane Ownership.[3]

The PPO also contained disclaimers about the risks of the proposal, and also the underlying assumptions. Among other things, the PPO assumed that the F-28 would be back in service by April 16, 2000, that American Falcon would have a Boeing 737 airplane in service by August 1, 2000, and a second Boeing 737 in service by January 1, 2001. PPO, Schedule of Assumptions to the Projections–2000 to 2001.

The Offering Documents did not disclose certain matters. The Offering Documents did not disclose Chehab's statements earlier in 2000

---

[3]The Exhibits were filed with the original Complaint (d/e 1-6), and are incorporated by reference into the Second Amended Complaint.

that the venture was too costly to operate and should be shut down, nor his threat to put the company in bankruptcy.  The Offering Documents did not disclose that the Capital Group paid only $500,000.00 for its stock.

Plaintiffs Robert Trask (Dr. Trask), Thomas Baron (Dr. Baron), and Christopher Mallavarapu (Dr. Mallavarapu) were all physicians living in Springfield, Illinois.  Dr. Trask was married to Plaintiff Mary Trask; Dr. Baron was married to Plaintiff Linda Baron; and Dr. Mallavarapu was married to Plaintiff Janet Mallavarapu.  Randall Martin was also a physician.  The Plaintiffs received the Offering Documents.  Bank SUF ¶¶ 2-19, 52-58.

On June 5, 2000, AMFAL Investment was formed.  A total of fourteen units were subscribed by investors.  The Trasks, Barons, and Mallavarapus, as married couples, each invested in one unit of AMFAL Investment, for a total of three units.  The Plaintiffs signed the Operating Agreement for AMFAL Investment on June 9, 2000.  The Operating Agreement recited that fourteen units were sold, rather than the ten proposed in the Offering Documents.  The Operating Agreement identified all of the investors.  The transaction was adjusted to reflect the fact that the offering was oversubscribed.  AMFAL Investment borrowed $4,200,000.00 from the

Bank and purchased 47 percent of the stock in American Falcon.  As a result AMFAL Investment still owned 3.33 percent of American Falcon stock for each investment unit in AMFAL Investment.  Each Plaintiff also signed a personal guarantee with the Bank guaranteeing the loan to AMFAL Investment.  <u>Bank SUF</u> ¶¶ 62-67.[4]

The guarantees were absolute, unconditional guarantees of payment which waived any and all defenses, including any failure of the Bank to perfect security interests in collateral.  The obligations of the guarantors were joint and several and were continuing until the obligation, including interest, fees, attorney fees and costs of collection, were paid in full.  <u>Bank Motion</u>, Exhibits 26-28, <u>AMFAL Investment Guarantees</u>.

AMFAL Investment paid $2,200,000.00 to American Falcon as a contribution of new capital for new stock.  AMFAL Investment paid $900,000.00 to existing shareholders to buy additional stock: $460,000.00 went to Chehab; and $440,000.00 was divided among Bentley, Shaw, Young, and Michaels.  Bentley received $110,000.00 for one third of his stock.  He had paid $90,000.00 for all of his stock less than a year earlier.

---

[4]The Plaintiffs disputed the Bank's SUF ¶ 65 only to the extent that the paragraph did not state that the guarantees were joint and several.  The obligations of the guarantors were joint and several.

Plaintiffs' Summary Judgment Exhibits (d/e 150) (Plaintiffs' Exhibits),

Exhibit K, Deposition of Steven Bentley on February 7, 2007, at 100-03,

134-35.  The Offering Documents did not disclose that AMFAL Investment

was paying more than three times the price paid by the Capital Group for

American Falcon stock.

    While AMFAL Investment was forming, Capital was looking for

airplanes to lease to American Falcon.  By May 10, 2000, Capital located a

Boeing 737 (Capital 737) to acquire and lease to American Falcon.  The

Capital 737 was already in Argentina.  The Capital 737 needed extensive

maintenance work.  Capital planned to purchase the Capital 737 for

$2,500,000.00 and lease it to American Falcon for $85,000.00 per month.

Capital planned to finance the purchase with a loan from Marine Bank of

Springfield, Illinois (Marine Bank).  In September 2000, Marine Bank

loaned Capital $3,100,000.00 to purchase the Capital 737.  The loan was

a short-term loan until the required maintenance was completed.  Capital

expected to arrange long-term financing and sell the Capital 737 to a limited

liability company that would, in turn, lease the Capital 737 to American

Falcon.  Bank SUF ¶¶ 69-73.

    In September 2000, Bentley presented a status report to AMFAL

Investment members.  The status report stated that the purchase of the Capital 737 had been completed, but the plane was not ready to fly because it had to undergo a maintenance check.  The report indicated the Capital 737 would start flying in January 2001.  The report also stated that the F-28 experienced mechanical problems and reduced its flying time.  The status report stated that an additional $2,367,039.00 was needed to keep the company going until the planes started flying.  The status report proposed that AMFAL Investment members loan $85,750.00 per membership unit to AMFAL Investment.  The report stated that the loans would be repaid from operational income in 2001.  Chrans and Chehab also told the AMFAL Investment members, including the Plaintiffs, that they needed the additional funds in connection with negotiations between Air France and American Falcon, to meet certain requirements set by Air France for a business relationship.  In November 2000, the Plaintiffs, as couples, made three loans to AMFAL Investment of $85,750.00 each.  The loans were evidenced by promissory notes repayable in one year at 10 percent interest. The loans were never paid back.  Bank SUF ¶¶ 74-76; Second Amended Complaint, ¶ 63; Answer and Affirmative Defenses of Chrans, Bentley and RES (d/e 107 & 108), ¶ 63.

12

On November 9, 2000, Capital entered into a Lease with American Falcon to lease the Capital 737.  Capital did not intend to charge rent until the Capital 737 was ready for service and properly registered in Argentina. Bank SUF ¶ 73.  American Falcon also discussed leasing the DC-9s.  The parties discussed leasing the DC-9s throughout 2001, but never completed those Leases.  Bank SUF ¶¶ 74, 77, 83, 95-102.

AMFAL Investment held another meeting on February 22, 2001.  At that point, the investors were told that the Capital 737 was still not flying and that Capital was having difficulty getting long-term financing for the Capital 737.  The Argentinian government would not authorize the Capital 737 to fly commercially in Argentina.  Bentley and Mallette presented a proposal to lease the DC-9s to American Falcon.  Bentley also presented financial statements for the fiscal year ending September 30, 2000, and for the year-to-date through January 31, 2001.  The statements showed a net loss of ($2,099,360.49) for the fiscal year ending September 30, 2000, and an additional net loss of ($1,193,960.95) for the four months from October 2000 through January 2001.  Bentley told the investors then the company would need another $1,477,513.00 to cover losses through May 31, 2001. He also told them that American Falcon would need an additional

13

$250,000.00 for each month that it was delayed in putting the planes into operation. He revised the projected 2001 first-quarter income from $410,377.00 in positive net income, to a loss of ($1,104,294.00). Bank SUF ¶¶ 77-80.

At the February 22, 2001, meeting, Chrans represented to Plaintiffs that American Falcon had secured $9,000,000.00 to $13,000,000.00 in charter revenue under contract. Plaintiffs' Exhibits, Exhibit Q, Deposition of Thomas Baron on February 14, 2007 (2-14-07 T. Baron Deposition), at 253-55; Bank Motion, Exhibit 50, Minutes of American Falcon Shareholders' Meeting on February 22, 2001 (February 22, 2001, Minutes). The members of AMFAL Investment also voted to have the members become the direct owners of the American Falcon stock that AMFAL Investment purchased in the original June 2000 transaction. Chrans Motion, SUF ¶ 46; February 22, 2001, Minutes.

AMFAL Investors next met on April 26 and 27, 2001. Capital and American Falcon had continued discussions regarding the Lease of the DC-9s. A proposal was approved for American Falcon to issue 640,000 additional shares at a price of $5.00 per share. Chehab would also receive 130,000 shares to minimize dilution of his ownership interest. The

remaining new shares would be sold to existing shareholders for a total additional investment of $2,500,000.00.  The agenda also contained a statement that American Falcon needed an additional $250,000.00 "by Monday."  Chehab stated that American Falcon needed $250,000.00 per month for every month until American Falcon had the DC-9s and the Capital 737 under lease and in operation.  Projections were presented that said that the Capital 737 could start flying in July and the DC-9s could start flying in September 2001.  <u>Bank SUF</u> ¶¶ 88-89, <u>Bank Motion</u>, Exhibit 62, <u>Minutes of American Falcon Shareholders Meeting on April 26-27, 2001</u>.

The members of AMFAL Investment met immediately after the April 27, 2001, American Falcon shareholders' meeting.  The members elected Plaintiff Janet Mallavarapu as Manager of AMFAL Investment.  Chrans had previously acted as Manager.   Janet Mallavarapu thereafter received monthly financial reports from Chehab.  <u>Bank SUF</u> ¶¶ 90-92.

On May 14, 2001, Bentley emailed the members of AMFAL Investment, including Plaintiffs Drs. Baron, Trask, and Mallavarapu, with information that American Falcon's financial statement showed that American Falcon had a net loss of ($2,005,551.00) for the period from October 1, 2000, to April 30, 2001.  <u>Bank SUF</u> ¶ 106.  On the same day,

Chehab sent an email to AMFAL Investment members reiterating that American Falcon needed $250,000.00 per month to stay afloat until the F-28 was returned to service and a 737 was secured and put into service.  He presented several options ranging from acquiring planes from other lessors, to purchasing planes, to closing the company.  Bank SUF ¶ 107.  Chrans, Chehab, and Bentley, however, also stated to Plaintiffs that they should ignore the financial statement showing American Falcon had lost more than $2,000,000.00 because the losses were incurred because Capital would not supply American Falcon with the Capital 737.  Plaintiffs' Exhibits, Exhibit I, Deposition of Christopher Mallavarapu on January 29, 2007 (1-29-07 C. Mallavarapu Deposition), at 155-56.

The American Falcon shareholders then met on May 22, 2001.  The chair asked for a motion to close the company, but no motion was forthcoming.  The shareholders discussed the pledges made to purchase the additional shares for the $2,500,000.00 approved at the April meeting. After the meeting, a letter was sent to each AMFAL Investment member and purportedly signed by Janet Mallavarapu.  The letter stated that each member was required to contribute an additional $6,380.00 per month to AMFAL Investment to service the Bank loan until the Capital 737 and

Capital DC-9s were in service for American Falcon.  Bank SUF ¶¶ 113, 116-17.

In April or May or June 2001, Dr. Mallavarapu met with Michael McGlasson, an officer of Bank of Springfield, to discuss the AMFAL Investment Guarantees.   During that meeting, McGlasson told Dr. Mallavarapu about the various loans between the Bank and Capital and about the strength of some of the other guarantors.  With respect to several of the guarantors, McGlasson said that he had no comment on the guarantor's financial condition.  After the meeting, the Plaintiffs became concerned that they were exposed to joint and several liability with co-guarantors who were weak credit risks.  McGlasson told Mallavarapu at the meeting not to worry about Capital because, despite its high debt structure, it always paid its bills.  Plaintiffs' Response to Bank's Motion for Summary Judgment (d/e 148) ( Plaintiffs' Response to Bank), at 17-18 Statement of Additional Undisputed Fact (Plaintiffs' Response to Bank SUF) ¶¶ 10-11.

Throughout the spring and summer of 2001, a group of AMFAL Investment members, along with Chrans and Chehab (collectively the 737 Group), discussed the possibility of buying another Boeing 737 airplane to lease to American Falcon.  The Plaintiffs were part of the 737 Group.  In

May 2001, Dr. Mallavarapu contacted McGlasson at the Bank to seek financing for the purchase of an airplane to lease to American Falcon.  The borrower would be the 737 Group.  On June 8, 2001, McGlasson wrote Dr. Mallavarapu to confirm that the Bank would provide financing, but the specifics of the loan would depend on the amount of the loan and the specific airplane involved.  <u>Bank SUF</u> ¶¶ 119.

Chrans told the Plaintiffs on July 2, 2001, that American Falcon had lucrative routes and just needed more planes to secure additional lucrative routes.  <u>Plaintiffs' Response to Chrans SUF</u> ¶ 58.

On July 9, 2001, Dr. Mallavarapu took Chehab to meet McGlasson to discuss financing the purchase of a Boeing 737 airplane.  McGlasson had not previously met or spoken to Chehab.  Following the meeting, the Bank committed to lend the group $4,200,000.00 to buy the plane, to be secured by a lien on the plane and personal guarantees of the investors.  <u>Bank SUF</u> ¶¶ 126-127.

Later that day, on July 9, 2001, American Falcon shareholders held their next meeting.  The Capital 737 was still not flying, and Capital and American Falcon had not agreed on a lease of the DC-9s.  Chehab asked shareholders to deposit the remainder of their prior financial commitments

to American Falcon by July 12, 2001. At the close of the meeting, the members of AMFAL Investment discussed refinancing the June 2000 $4,200,000.00 AMFAL Investment loan. Bank SUF ¶¶ 125, 129. On July 22, 2001, a reminder letter was sent to each AMFAL Investment member, purportedly signed by Janet Mallavarapu, stating that the $6,380.00 monthly payment was due to AMFAL Investment for the August bank loan payment. Bank SUF ¶ 133.

In August 2001, AMFAL Investment and its members refinanced the June 2000 $4,200,000.00 note. Some members exchanged their $300,000.00 guarantees for promissory notes with a principal balance of $248,509.68. AMFAL Investment signed a note for $728,823.64 to refinance the debt from some of the members who did not exchange their guarantees for personal loans. The Plaintiffs all exchanged their guarantees for personal loans and were no longer obligated to the Bank on the original June 2000 guarantees. The Bank did not call the guarantees. Bank SUF ¶¶ 134-138.

On August 25, 2001, the Bank loaned $3,000,000.00 to American Falcon. The $3,000,000.00 was then deposited into a Certificate of Deposit at the Bank to secure the loan. McGlasson understood that this transaction

was intended to allow American Falcon to list the borrowed funds as cash reserves on its balance sheet to satisfy Argentinian airline regulators. The Bank did not disclose this $3,000,000.00 loan to the Plaintiffs. <u>Plaintiffs' Response to Bank SUF</u> ¶¶ 14-16. Chrans approved this transaction as a director of American Falcon. <u>Plaintiffs' Response to Chrans SUF</u> ¶ 59.

In August 18, 2001, the 737 Group met with an investment advisor called the Opes Group to discuss structuring the investment in this new 737 airplane. The Opes Group provided a proposal that involved setting up a foreign business corporation and transferring income paid to that corporation in an effort to defer income tax. The Opes Group presentation also contained a discussion of the risks involved and noted that the investors could be personally liable for the full amount of the bank loans should the venture fail. <u>Bank SUF</u> ¶¶ 139-43.

On September 9 and 10, 2001, Chrans notified the 737 Group that he had located an airplane available for purchase. The purchase plan called for borrowing $4,000,000.00 from the Bank guaranteed by the investors. On September 12, 2001, Chrans told the 737 Group members that they would realize monthly gross revenues ranging from $85,000.00 to $95,000.00 with a positive net cash flow of $26,000.00 to $34,500.00 per

month on their investment.  <u>Plaintiffs' Response to Chrans SUF</u> ¶ 60.[5]

Chrans sent an email to Plaintiffs on September 19, 2001, regarding a

possible purchase of a 737.  He stated that the purchase price would be

$3,800,000.00, with a $200,000.00 rebate paid back by the seller.  On

October 12, 2001, the 737 Group organized ROTFL, LLC (ROTFL) to

purchase the plane.[6]  The Plaintiffs were members of ROTFL.  <u>Bank SUF</u>

¶¶ 144-45, 151, 165.

Around this time, Chrans told the Plaintiffs that American Falcon just

needed time and equipment to be successful.  Chrans told the Plaintiffs that

the addition of another Boeing 737 would allow American Falcon to take

full advantage of the business opportunities continuing to flow to the

company.  <u>Plaintiffs' Response to Chrans SUF</u> ¶¶ 61-62.  Chrans also told

the Plaintiffs in the fall of 2001 not to be alarmed by Chehab's email

warnings about American Falcon's dire financial condition.  Chrans told

them that Chehab was trying to raise additional capital.  <u>Plaintiffs'</u>

<u>Response to Chrans SUF</u> ¶ 63.  From October 2001 through September 13,

---

[5]The Plaintiffs refer to the investor group as the ROTFL members, but ROTFL LLC had not yet been organized in September 2001.

[6]No party cites any evidence that explains the meaning of "ROTFL".

2004, Chrans did not provide the Plaintiffs with any financial statements for American Falcon. During this time, Chrans represented to Plaintiffs time and again that American Falcon was on the verge of profitability. Plaintiffs' Response to Chrans SUF ¶ 64.

On November 1, 2001, the Bank loaned ROTFL and Western Equipment Leasing Company, LLC, $4,050,000.00 (ROTFL Loan) to buy a second Boeing 737 (ROTFL 737).[7] Chrans was affiliated with Western Equipment Leasing. Each Plaintiff personally guaranteed the ROTFL Loan up to $1,050,000.00, which guarantees were subsequently reduced to $840,000.00 each, when Chehab gave the Bank a mortgage on some real estate in France. Bank SUF ¶¶ 166-174. The guarantees were absolute, unconditional guarantees of payment unaffected by any modification, renewal or extension of the loan agreement, or any failure to perfect any lien or security interest in collateral, or to release any collateral. The Plaintiffs waived any obligation of the Bank to provide information or notices to the Plaintiffs or to seek repayment from any other source before demanding

---

[7]Plaintiffs assert that Chrans omitted and concealed the fact that the actual market value of ROTFL 737 was considerably less than $4,000,000.00. Plaintiffs' Response to Chrans, at 21, ¶ 69. This assertion, however, is based only on hearsay. Plaintiffs' Exhibits, Exhibit V, Deposition of Robert Trask on March 5, 2007 (3-5-2007 R. Trask Deposition), at 69-71. Hearsay is not competent evidence to oppose summary judgment. Fed. R. Civ. P. 56(e).

payment from them as guarantors.   The guarantees recited that the Plaintiffs performed their own investigation and relied on their own information in making these guarantees and assumed all risks associated with the guarantees and relieved the Bank of any obligations to inform them of the borrower's financial condition.   The guarantees further allowed the Bank to apply any payment from any source in any manner the Bank wished.   The guarantors also agreed to be responsible for all interest, attorney fees and cost of collection. <u>Bank Motion</u>, Exhibits 200-02, <u>ROTFL Guarantees</u>.   The Bank was also given a mortgage lien on the ROTFL 737. About the time of the ROTFL loan closing, McGlasson told Baron that if the Bank wanted to foreclose on the aircraft it could be flown out of the country to a different site for repossession.   <u>Plaintiffs' Response to Bank SUF</u> ¶ 28.   The Bank registered its mortgage in Argentina on the ROTFL 737.   <u>Bank SUF</u> ¶ 182.

The seller of the ROTFL 737 paid ROTFL a $400,000.00 rebate on the sale.   Chrans told the Plaintiffs that the rebate would be used to purchase additional shares of American Falcon for ROTFL members. In fact, the money was contributed to American Falcon without any additional shares or other consideration given in return. <u>Plaintiffs' Response to Chrans</u>

SUF ¶¶ 70, 71.

Capital and American Falcon continued to have difficulties reaching an agreement on the lease of airplanes.  The Lease on the Capital 737 would end by the end of 2001.  Capital wanted a five-year renewal of the Lease, but American Falcon wanted a one-year term.  Bank SUF ¶ 153.   In December 2001, the Lease on the F-28 expired, and the plane was placed in storage in Buenos Aires.  At or about the same time, American Falcon was finally able to start flying the Capital 737.  Bank SUF ¶ 214; Chrans SUF ¶ 99.

By the beginning of 2002, Capital, however, was still unable to secure permanent financing on the Capital 737.  In February and March 2002, Marine Bank called Capital's loan on the Capital 737 and the guarantees of that debt.  Marine Bank offered Capital the options of: (1) making monthly payments on the debt, or (2) taking the Capital 737 back from American Falcon and leasing it to another airline.  Capital opted for the latter option. The repossession was delayed throughout 2002.  At one point, one of the guarantors of the Marine Bank loan, Claude Fortin, attempted to secure alternate financing.  During this time, American Falcon retained possession of the Capital 737.  Bank SUF ¶¶ 200, 220-23; Chrans SUF ¶ 130.  Capital

ceased operations in November 2002.  Chrans SUF ¶ 129.

In April 2002, Chrans advised the Plaintiffs that American Falcon would not be able to make lease payments to ROTFL.  As a result, the Plaintiffs contributed to ROTFL $11,214.00 per couple, per month in 2002 and early 2003, for a total of $100,926.00 per couple.  The money was deposited into a ROTFL account and used to make payments to the Bank. Bank SUF ¶¶ 203-05.  Plaintiffs' Response to Bank SUF ¶¶ 35-36.

In May and June 2002, McGlasson, Chehab, and representatives of Cap III met to discuss repairing the F-28 and putting it back in service. American Falcon would rent the plane on an hourly basis.  In June 2002, the Bank loaned $275,000.00 to Cap III to repair the F-28 and get it back into service.  Bank SUF ¶¶ 214-15.

In July 2002, Chrans and Chehab presented the Barons and the Mallavarapus with the opportunity to participate in the purchase of a competing carrier called Dinar.  Dinar was in financial distress and owed money to American Falcon.  Chrans and Chehab told the Mallavarapus and the Barons that the purchase of Dinar would provide an opportunity to collect the money owed to American Falcon, acquire new routes and more airplanes.  The Mallavarapus and the Barons sent Chehab $250,000.00 per

couple to invest in Dinar. Chrans and Chehab represented that each couple would be a 25 percent owner of Dinar; Chrans and Chehab would each own 25 percent also. According to Dr. Baron, Chrans and Chehab represented that Dinar filed bankruptcy proceedings in Argentina and stopped operating. According to Dr. Baron, Chrans and Chehab did not invest the money in Dinar, but he never learned where the money went. 2-14-07 T. Baron Deposition, at 67-72, 91-93; 2-15-07 T. Baron Deposition, at 10-14. According to Chrans, Dinar was purchased while it was in bankruptcy, but Dinar did not successfully come out of bankruptcy and was closed. Chrans stated that a creditor called Banco Nacion arbitrarily took Dinar's revenues in violation of Argentinian bankruptcy laws and effectively forced the closure. Plaintiffs' Exhibits, Exhibit N, Deposition of Willis Chrans on February 9, 2007, at 285-91; and Exhibit XX, Chehab October 6, 2002, email.

On January 10, 2003, a new limited liability company called Alpha Foxtrot, LLC (Alpha Foxtrot) was formed to purchase the Capital 737. On that date, Chehab sent McGlasson a proposal to have Alpha Foxtrot borrow $2,000,000.00 from the Bank to finance the purchase of the Capital 737 from Capital. Under the proposal, $1,700,000.00 of the proceeds would be

used to purchase the plane, and the remaining $300,000.00 would be used for required maintenance. On January 15, 2003, Chrans and Chehab sent an email to the Plaintiffs outlining the terms of the proposal to purchase the Capital 737. The email stated that the current guarantors, Jeremy Michaels and Claude Fortin, would remain as guarantors up to $700,000.00. The Plaintiffs and Chrans and Chehab would each sign guarantees up to $250,000.00. The email also stated that the Plaintiffs should anticipate a profitable year for American Falcon. <u>Bank Motion</u>, Chrans Exhibit 79, <u>January 15, 2003, email</u>. Thereafter, in January 2003, the Plaintiffs became members in Alpha Foxtrot. The Bank agreed to make the $2,000,000.00 loan to Alpha Foxtrot to purchase the Capital 737. The Plaintiffs signed the Alpha Foxtrot Operating Agreement on January 27, 2003. The loan closed on January 31, 2003. The Plaintiffs signed guarantees limited to $250,000.00 to guarantee this debt. <u>Bank SUF</u> ¶ 245; <u>Chrans SUF</u> ¶ 131.[8] The dollar limits on the Plaintiffs' ROTFL and Alpha Foxtrot guarantees totaled $1,090,000.00 per Plaintiff couple ($840,000.00 on the ROTFL

---

[8]The Plaintiffs claim that Chrans concealed the fact that the Capital 737 was worth considerably less than $1,700,000.00. <u>Plaintiffs' Response to Chrans</u>, at 24, ¶ 79. This assertion, however, is based only on hearsay. <u>2-14-07 T. Baron Deposition</u>, at 247. Hearsay is not competent evidence to oppose summary judgment. <u>Fed. R. Civ. P.</u> 56(e).

guarantee and $250,000.00 on the Alpha Foxtrot guarantee). The Alpha Foxtrot guarantees were unconditional, absolute guarantees with substantially the same terms as the ROTFL guarantees. <u>Bank Motion</u>, Exhibits 293, 295-96, <u>Personal Guarantees</u>.

At the closing on the Alpha Foxtrot loan, Dr. Trask asked McGlasson about the risk in connection with the loan and the guarantees. McGlasson advised Trask that the incremental risk was minimal in the range of $100,000.00 to $200,000.00. McGlasson said that the Bank would have a lien on the Capital 737 and would to attempt to repossess and sell the plane before looking to the guarantors. <u>Plaintiffs' Exhibits</u>, <u>Deposition of Robert Trask on February 20, 2007 (2-20-07 R. Trask Deposition)</u>, at 49-53, 58. At some point, in connection with either the ROTFL loan or the Alpha Foxtrot loan, McGlasson stated to the Trasks that the loan for the purchase of an airplane was just like a real estate mortgage because the plane was collateral to secure the loan and the Bank would look to the collateral before calling the guarantees. <u>Id.</u>, at 58; <u>Plaintiffs' Exhibits</u>, Exhibit T, <u>Deposition of Mary Trask</u>, at 115.

The Bank did not register its mortgage on the Capital 737 in Argentina. McGlasson states that Chehab asked for permission to file the

documents in Argentina to save money, and McGlasson agreed.  Chehab, however, never registered the documents.  Bank SUF ¶ 255.

In May 2003, Chehab contacted the Bank regarding the possibility of American Falcon purchasing the F-28.  While these negotiations were ongoing, Drs. Baron and Mallavarapu traveled to Argentina.  Dr. Baron remembered meeting with Chrans and Chehab to discuss participating in a group to buy the F-28.  The Plaintiffs also state that Chrans and Chehab did not disclose to them that the engines on the F-28 were "timed out" and could not be returned to service.  Drs. Baron and Mallavarapu ultimately decided to participate in the venture.  The venture was organized as an Argentinian corporation known as Falcon Air, S.A., (Falcon Air).  Drs. Baron and Mallavarapu state Chehab and Chrans told them that the four of them would own Falcon Air, each would own 25 percent of the stock. Drs. Baron and Mallavarapu state that Falcon Air never issued any stock to them.  The Plaintiffs claim Chrans, in fact, set up Falcon Air to be held solely by Chrans and Chehab.  Plaintiffs' Exhibits, 2-14-07 T. Baron Deposition, at 101-03, 114-16; Exhibit R, Deposition of Thomas Baron on February 15, 2007 (2-15-07 T. Baron Deposition), at 79-82; 1-29-07 C. Mallavarapu Deposition, at 175-78, 274-76.  Chrans states that he was not

involved in the Falcon Air transaction.  <u>Chrans Motion</u>, Exhibit 7, <u>Declaration of Willis Chrans (Chrans Declaration)</u>, ¶ 22.

Falcon Air proposed to the Bank to borrow $3,700,000.00.  The purchase price for the F-28 would be $2,700,000.00, and the remaining $1,000,000.00 would be used for repairs and maintenance.  Chehab sent McGlasson an email on June 3 or 4, 2003, stating that the value of the F-28, after repairs, would be anywhere between $1,100,000.00 and $1,500,000.00.  <u>Plaintiffs' Exhibits</u>, Exhibit X, <u>Deposition of Michael McGlasson on March 7, 2007</u>, at 148.

On June 24, 2003, Chehab sent an email to Chrans, Dr. Baron, and Dr. Mallavarapu telling them that $1,000,000.00 in proceeds over the purchase price would be used to pay operational expenses rather than for maintenance and repairs on the F-28.  He also said not to tell the Bank representatives about this.  <u>Bank SUF</u> ¶ 270.  Dr. Baron states that he told Kelley about the plan to use the $1,000,000.00 to pay debts.  According to Dr. Baron, Bank's loan officer James Kelley responded, "[T]hat's what we thought he probably would do with the money."  <u>2-15-07 T. Baron Deposition</u>, at 218.

The Falcon Air loan closed on July 11, 2003.  The Bank loaned Falcon

Air $3,700,000.00.  Chehab, Chrans, the Barons and the Mallavarapus extended their guarantees of the ROTFL and Alpha Foxtrot loans to guarantee this loan as well.  <u>Bank SUF</u> ¶ 272.  The Bank agreed to let Chehab register the Bank's mortgage lien on the F-28.  Chehab never registered the Bank's mortgage.  <u>Bank SUF</u> ¶ 276.[9]

On September 3, 2003, the Argentinian government announced that it planned to give a fuel subsidy to a competing airline called Southern Winds, S.A. (Southern Winds).  <u>Bank SUF</u> ¶ 279.  Thereafter, American Falcon sought unsuccessfully to be included in the proposed subsidy.

American Falcon and the related entities had difficulty making the payments on the various loans to the Bank.  The Bank agreed to interest-only payments on the ROTFL loan for August, September and October 2003.  Even so, the September payment was late for all of the loans, including the ROTFL interest-only payments.  The Bank agreed to take a reduced payment of $35,000.00 for all of the loans in September 2003. The actual amount due was over $69,302.53.  <u>Bank Motion</u>, Exhibit 327, <u>Kelley email dated September 25, 2003</u>, and Exhibit 328, <u>Chrans email</u>

---

[9]The Plaintiffs dispute whether the Bank made this decision before or after the closing of the loan.  <u>Plaintiffs' Response to Bank</u>, at 12, <u>Response to Bank SUF ¶ 276</u>.

dated September 26, 2003.  In November 2003, the Bank agreed to modify the payment schedule to allow higher payments in some months of the year and lower payments in other months to track the seasonal nature of American Falcon's business.  Bank SUF ¶ 287.

Between November 18 and 22, 2003, Kelley traveled to Buenos Aires on behalf of the Bank to meet with Chehab and Chrans.  Dr. Trask states that Kelley spoke to him before he went.  Dr. Trask states that Kelley told Dr. Trask that he would find out as much as possible and report to Dr. Trask.  Plaintiffs' Response to Bank, Exhibit U, 2-20-2007 R. Trask Deposition, at 196.  In Argentina, Kelley photographed American Falcon's offices and gathered other information.  Kelley prepared a Power Point presentation to show to the Bank's Board of Directors.  Upon his return to Springfield, Kelley sent an email to Chehab and Chrans which said, in part: "I will be sharing my presentation with [the Trasks] . . . .  I will continue to show my support and enthusiasm for your great company."  Plaintiffs' Response to Bank SUF ¶ 79.

Kelley then showed the presentation to the Trasks, and McGlasson was also present.  The other Plaintiffs did not see the presentation.  According to the Trasks, Kelley was generally very positive.  He left the

Trasks with the feeling that their American Falcon investments were very promising.  Dr. Trask asked McGlasson and Kelley if it was a good idea to continue to invest in American Falcon.  Dr. Trask states that he told McGlasson and Kelley about Chehab's offer to sell him additional shares. According to Trask, McGlasson and Kelley stated that American Falcon had good business prospects, good prospects for profitability, good routes and planes, and lots of business expansion opportunities.  They also stated that the economy was improving, that the picture looked optimistic, and that American Falcon was a good place for their money.  After the meeting, Dr. Trask sent $100,000.00 to Chehab to buy additional American Falcon stock.  Mary Trask Deposition, at 22, 119-20; 2-20-07 R. Trask Deposition, at 66, 190-92.

At about the same time as the Power Point presentation, the Plaintiffs state that Kelley told Dr. Baron that things were looking up and were getting better at American Falcon and that the Bank's interests were really the same as the guarantors', and that they all wanted the same thing.  2-16-07 T. Baron Deposition, at 52-56.

Throughout this time, Chehab attempted to persuade various governmental officials to include American Falcon in the proposed fuel

subsidy for Southern Winds.  The Plaintiffs attempted to enlist the help of U.S. officials to lobby for the subsidy, also.  Kelley participated in these efforts.  Kelley traveled to Argentina in February 2004, to participate in a meeting with an American official at the United States Embassy.  Baron, Chehab and Chrans were also at the meeting.  The efforts all proved unsuccessful.  Bank SUF ¶¶ 303-04.

On March 2, 2004, Chrans notified the Plaintiffs that American Falcon would not be able to make good on the $40,000.00 check it had sent to the Bank as a payment on the ROTFL, Alpha Foxtrot and Falcon Air loans.  On March 3, 2004, Chrans told the Plaintiffs that he had contacted Kelley to find out how the Plaintiffs should deposit funds to make the check good.  Kelley told Chrans that the funds should be deposited into American Falcon's account on which the check was drawn.  The Plaintiffs did so.  On March 4, 2004, Kelley sent an email to the Plaintiffs, Chehab, and Chrans, that said, "I will send the American Falcon check over for processing tomorrow. Thank you."  Bank SUF ¶¶ 305-09.  Chehab stopped all operations of American Falcon in March or April 2004.  Chrans SUF ¶ 147. American Falcon resumed flights in June 2004.  Chrans SUF ¶ 156.

In April 2004, Chrans gave Chehab a general power of attorney on

behalf of Alpha Foxtrot and Falcon Air which authorized Chehab to grant liens on the planes owned by those entities.  <u>Plaintiffs' Exhibits</u>, Exhibit O, <u>Deposition of Willis Chrans on March 28, 2007 (3-28-07 Chrans Deposition)</u>, at 526-28; <u>2-14-07 T. Baron Deposition</u>, at 145-46.  Chehab subsequently used the powers of attorney to place liens on the aircraft to secure a personal loan to him from Aerolineas Argentina, discussed below.

On May 16-17, 2004, the Bank made another loan to Falcon Air in the amount of $410,070.00 to use to purchase an engine for the F-28.  The personal guarantees of Chehab, Chrans, the Barons, and the Mallavarapus made in connection with the loans to ROTFL and Alpha Foxtrot were extended to cover this debt to Falcon Air.  <u>Bank SUF</u> ¶ 316.

In 2004, an airline known as Lan Chile offered to purchase American Falcon.  Lan Chile offered to pay approximately $2,500,000.00 for American Falcon and to lease the Capital 737 and F-28 for two years.  At the same time, Chehab negotiated an alternative proposal in which Aerolineas Argentina would lend $2,000,000.00 to Chehab personally to finance American Falcon.  <u>Chrans SUF</u> ¶156.

In July 2004, there was a telephone conference to discuss these options.  Kelley participated in the telephone conference.  Kelley told

investors that the Aerolineas Argentina proposal was a better deal, that no one besides Chehab could have pulled it off, and that it was a great thing. Kelley stated that the proposal was better because the planes would be leased longer.  Dr. Mallavarapu stated based on Kelley's advice, the Lan Chile offer was rejected, and Chehab was authorized to make the personal loan from Aerolineas Argentina secured by the Alpha Foxtrot and Falcon Air airplanes.  The Plaintiffs did not know at this time that the Bank had not registered its liens on these planes.  Plaintiffs' Exhibits, Exhibit J, Deposition of Christopher Mallavarapu on January 30, 2007 (1-30-07 C. Mallavarapu Deposition), at 18-21; Chrans SUF ¶¶ 150, 156.  Thus, Aerolineas Argentina secured a first lien position on the Capital 737 and F-28 and effectively cut off the Bank's liens on these planes.

On or about July 6, 2004, Chrans executed an Agreement on behalf of ROTFL and Alpha Foxtrot selling to Chehab for $40.00, more than $5,000,000.00 in outstanding lease payments that American Falcon owed to ROTFL and Alpha Foxtrot.  Chrans Deposition, at 17-18; Second Amended Complaint, ¶¶ 172-74 and Chrans' Answer and Affirmative Defenses (d/e 107), ¶¶ 172-74.  Chrans stated that he did this to make American Falcon solvent; otherwise Chrans understood that Argentinian law

would require the immediate liquidation of American Falcon. <u>Chrans Motion</u>, Exhibit 7, <u>Declaration of Willis Chrans</u>, ¶ 26.

By September 2004, ROTFL, Alpha Foxtrot, and Falcon Air were all in default on their loans to the Bank. Chrans sent an email to Drs. Trask, Baron, and Mallavarapu attaching a financial statement. The financial statement showed a cumulative loss for the fiscal year through July 2004 of ($4,183,115.98). On or about September 24, 2004, the Bank, the borrowers, and the guarantors entered into a Loan Consolidation and Forbearance Agreement (2004 Agreement). The 2004 Agreement restructured the payments on all of the outstanding debt. The borrowers were to pay $90,000.00 by September 30, 2004. Thereafter, for four months, the total monthly payment on all of the loans would be $120,000.00; for the next four months, the total monthly payment would be $130,000.00; for the next four months, the total monthly payment would be $140,000.00; and thereafter the total monthly payment would be $150,000.00. In exchange, the Bank agreed to forbear pursuing other remedies, and the guarantors waived any defenses that they might raise based on the 2004 Agreement and reaffirmed their obligation to pay the debts under the terms of the guarantees. <u>Second Amended Complaint</u>,

Exhibit 20, <u>Loan Consolidation and Forebearance Agreement</u>.

On September 27, 2004, Kelley sent the 2004 Agreement to the Plaintiffs for signature. Kelley stated in the email, in part: "From the reports I am receiving American Falcon is in as [sic] the best shape ever. The high season is rapidly approaching and the expectations are for a very busy season. Please do not delay in returning this document to me. I must have this completed by September 29, 2004." <u>Plaintiffs' Response to Bank SUF</u> ¶ 99.

On September 30, 2004, American Falcon borrowed another $3,000,000.00 from the Bank. As in the August 2001 transaction, the $3,000,000.00 was placed in a Certificate of Deposit at the Bank to secure the loan. Kelley understood the loan was used to meet Argentinian legal requirements for solvency. This transaction was not disclosed to the Plaintiffs. <u>Plaintiffs' Response to Bank SUF</u> ¶¶ 104-06.

On October 28, 2004, Chrans told the Plaintiffs that things were turning around for American Falcon, and its cash flow would improve over the next three months. <u>Plaintiffs' Response to Chrans SUF</u> ¶ 95. By November, however, American Falcon defaulted on the 2004 Agreement. The November and December 2004 payments were not made on time.

<u>Plaintiffs' Response to Bank SUF</u> ¶ 89.

At about that time, Chrans was soliciting money from the Mallavarapus to buy another airplane referred to as the Cardinal airplane. Chrans, however, did not disclose to the Plaintiffs that Chrans, Bentley and Chehab had set up a company called Wild West Airplanes, Inc., and purchased the Cardinal airplane in October 2004. <u>3-28-07 Chrans Deposition</u>, at 574-592, 602-11; <u>1-30-07 C. Mallavarapu Deposition</u>, at 63.

In November and December 2004, Kelley contacted Drs. Baron, Mallavarapu, and Trask to ask them to contribute money to make the payments called for under the 2004 Agreement. Kelley told the Plaintiffs that he was concerned because the bank examiners were coming, and if the Bank had a certain percentage of non-performing loans, the Federal Reserve would increase the rate charged to the Bank and decrease the Bank's profit. Kelley said that the Bank's President Tom Marantz would get very mad about this situation at board meetings. Kelley asked the three men to help the Bank out by providing money to cover these payments. Kelley also said to Dr. Trask that the infusion of additional capital would give American Falcon some breathing room so that it could return to profitability. <u>2-14-07 T. Baron Deposition</u>, at 153-55; <u>1-30-07 C. Mallavarapu Deposition</u>, at 39;

<u>2-20-07 R. Trask Deposition</u>, at 210-13.

In response, the Plaintiffs, as couples, each made payments of $26,667.00 to the Bank in November and December 2004 for a total of $53,334.00 per couple. <u>Plaintiffs' Response to Chrans SUF</u> ¶¶ 91-93.

About this time, Kelley also told Dr. Baron that Bank President Marantz stated that he thought Chehab was a crook, but McGlasson thought he was an honest man trying to do the best he could. Kelley never previously disclosed Marantz's opinion of Chehab to Plaintiffs. <u>2-14-07 T. Baron Deposition</u>, at 156-58.

In the meantime, Chrans continued to solicit funds from the Mallavarapus to buy another airplane. The Mallavarapus ultimately contributed $500,000.00 for the purchase of a plane identified as the Ryan aircraft. <u>See</u> <u>Bank Motion</u>, Exhibit 465, <u>Summary of Plaintiffs' Payments, Mallavarapu $500,000.00 Payment to Chehab on January 31, 2005</u>. The funds were not used to purchase the plane. Chrans did not disclose the purpose for which the funds were used. <u>1-30-07 C. Mallavarapu Deposition</u>, at 63-68; <u>3-28-07 Chrans Deposition</u>, at 574-92, 602-11.

On January 12, 2005, Chrans emailed Drs. Trask, Baron, and Mallavarapu with a financial statement for American Falcon for the months

of October and November 2004.  The statement showed a loss in October
of ($356,888.00), and a loss in November of ($248,395.00).  <u>Chrans
Motion</u>, Exhibit 74, <u>January 12, 2005, Email</u>.

In February 2005, there was a meeting between Chrans, Chehab, Dr.
Baron, Dr. Mallavarapu, and Kelley.  Kelley and the others learned at this
time that Chehab had not perfected the Bank's liens on the Falcon Air and
Alpha Foxtrot planes, but, instead, had granted liens on those planes to
Aerolineas Argentina to secure the personal loan to him.  The men also
discussed modifying the 2004 Agreement further to restructure the
payments to the Bank once more.  <u>1-29-07 C. Mallavarapu Deposition</u>, at
190-91; <u>1-30-07 C. Mallavarapu Deposition</u>, at 17-27.  Also in February
2005, Kelley told Mrs. Baron that American Falcon was worth between
$50,000,000.00 and $60,000,000.00 and that she was going to be a rich
woman.  <u>Plaintiffs' Exhibits</u>, Exhibit P, <u>Deposition of Linda Baron on
February 13, 2007</u>, at 20.

The negotiations regarding modifying the 2004 Agreement continued
and culminated in a Modification of Loan Consolidation and Forbearance
Agreement dated May 2005 (2005 Agreement).  <u>Bank Motion</u>, Exhibit 467,
<u>2005 Agreement</u>.  The 2005 Agreement provided for interest-only payments

until October 2005.   In connection with the 2005 Agreement, the guarantors, including the Plaintiffs, executed an Agreement entitled "Agreement of Guarantors and Lender" (2005 Guarantor Agreement). <u>Bank Motion</u>, Exhibit 468, <u>2005 Guarantor Agreement</u>.  Under the terms of the 2005 Guarantor Agreement, each guarantor affirmed his or her obligations under the guarantees, and further agreed that in the event of a default on the 2005 Agreement, each guarantor would execute a personal promissory note in favor of the Bank in the total amount of each guarantor's obligations under the guarantees.  Thereafter, on May 30, 2005, American Falcon filed for bankruptcy in Argentina.  <u>Bank SUF</u> ¶ 338.

By the end of June 2005, the loans were going to be 90 days past due. The Bank then made a $150,000.00 loan to Chehab on June 30, 2005.  The proceeds of the loan were used to make a payment on the outstanding debt. The Bank treated the transaction as a partial call of Chehab's guarantee in the amount of $150,000.00.  In connection with this loan, Chrans signed unlimited guarantees on behalf of ROTFL and Alpha Foxtrot, guaranteeing Chehab's debt to the Bank.  Thereafter, Chrans resigned as Manager of Falcon Air and Alpha Foxtrot.  Chehab has not repaid the loan to the Bank. <u>Plaintiffs' Exhibits</u>, Exhibit AA, <u>Deposition of James Kelley on March 13,</u>

2007, at 39-45.

On July 28, 2005, the Bank sent notices to the Plaintiffs that the loans were in default.  The Bank gave the Plaintiffs ten days to cure the default. Under the 2005 Agreement, the Plaintiffs were to sign new promissory notes in exchange for their guarantees if the defaults were not cured.  The Plaintiffs neither cured the defaults nor signed any new notes.  Bank SUF ¶¶ 355-56.

Thereafter, the Bank has attempted to collect from the various guarantors.  Chrans executed a promissory note in favor of the Bank for $716,667.00.  Jeremy Michaels executed a promissory note in favor of the Bank for $610,000.00.  Chehab borrowed $1,090,000.00 from the Bank. The proceeds from all of these loans were applied to the ROTFL, Alpha Foxtrot, and Falcon Air debts.  Another guarantor, Dr. Sigsbee Duck, paid the Bank $730,000.00 which was also applied to the outstanding loans of the companies.  The Plaintiffs, however, did not pay anything after the Bank declared the default.[10]

As of January 1, 2008, the outstanding balances on the loans are:

---

[10]Guarantors Fortin and Martin filed bankruptcy and discharged their obligations to the Bank.  Bank SUF ¶ 289; Opinion entered May 10, 2006 (d/e 94), at 5.

ROTFL          $2,359,849.45 principal, and

$1,145,282.59 interest;

Alpha Foxtrot   $1,127,302.45 principal, and

$536,038.56 interest;

Falcon Air (I)   $1,950,562.90 principal, and

$944,719.44 interest; and

Falcon Air (II)   $393,947.69 principal, and

$182,108.39 interest.

The per diem accrual of interest is:

ROTFL           $1,163.76;

Alpha Foxtrot    $555.93;

Falcon Air (I)    $961.92; and

Falcon Air (II)   $194.28.

Bank SUF ¶¶ 361-62.  The total dollar limit on the face of the guarantees

signed by each Plaintiff couple in connection with the outstanding loans was

$1,090,000.00, plus interest, attorney fees, and costs of collection.

As alluded to above, from 2000 to 2005, the Plaintiffs paid various

sums over time in relation to American Falcon, ROTFL, Alpha Foxtrot, and

Falcon Air ventures.  The total sums paid by each Plaintiff couple are as

follows:

| | |
|---|---|
| The Mallavarapus: | $3,647,049.00; |
| The Barons: | $1,624,898.00; and |
| The Trasks: | $1,175,868.00. |

Bank Motion, Exhibit 485, Summary of Plaintiff Payments; 2-14-07 T.

Baron Deposition, at 189; 1-25-07 J. Mallavarapu Deposition, at 18-19; and

2-19-07 M. Trask Deposition, at 26-27.[11]

## ANALYSIS

The Plaintiffs bring claims against the Defendants for federal securities

fraud (Count I), common law fraud (Count II), negligent misrepresentation

(Count III), fraudulent concealment (Count IV), consumer fraud in

violation of the Illinois Consumer Fraud Deceptive Business Practice Act

(Consumer Fraud Act) (Count V), state securities law fraud (Count VI),

breach of fiduciary duty (Counts VIII and IX), and civil conspiracy (Count

XII).  15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5; 815 ILCS 505/2; 815 ILCS

5/12(F).  The other counts have been dismissed.  The Bank counterclaimed

---

[11]The Plaintiffs provide hearsay evidence of an expert's opinion that disputes these numbers.  Plaintiffs' Exhibits, Exhibits A-F, Plaintiffs' Declarations.  Such hearsay is not competent to oppose a summary judgment motion.  Fed. R. Civ. P. 56(e).  In addition, Mary Trask stated in her deposition that there may have been more investments, but she provided no details.  M. Trask Deposition, at 27.

for the sums due and owing on the debts guaranteed by the Plaintiffs.  The Bank, McGlasson, and Kelley have now settled with the Plaintiffs.  The remaining Defendants all seek summary judgment.

At summary judgment, each Defendant must present evidence that demonstrates the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to the Plaintiffs.  Any doubt as to the existence of a genuine issue for trial must be resolved against a Defendant.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). Once a Defendant has met his burden, each Plaintiff must then present evidence to show that issues of fact remain with respect to an issue essential to his or her case, and on which he or she will bear the burden of proof at trial.  <u>Celotex Corp.</u>, 477 U.S. at 322; <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Defendants Bentley and RES have demonstrated a right to summary judgment on all claims; Defendant Chrans has demonstrated a right to partial summary judgment. The Court addresses the Motions for Summary Judgment on the Plaintiffs' claims against Bentley and RES, and then Chrans.

I.     <u>THE PLAINTIFFS' CLAIMS AGAINST BENTLEY AND RES</u>

The evidence of wrongful conduct by Bentley and RES concern the June 2000 transaction in which the Plaintiffs acquired membership interests in AMFAL Investment, and AMFAL Investment acquired stock in American Falcon.  Bentley and RES were involved in preparing and distributing the Offering Documents.  Bentley also cashed in one-third of his investment, turning $90,000.00 into $110,000.00 in less than a year.

Thereafter, however, RES and Bentley had little involvement with the Plaintiffs. Bentley provided some financial statements that showed significant losses.  Bentley also made a presentation in 2001 about leasing airplanes to American Falcon.  No evidence indicates that any of these activities involved any misrepresentations or fraudulent conduct.  RES is not mentioned significantly in the evidence after the initial offering.  Bentley was involved in the Wild West Airlines in 2004, but Plaintiffs present no evidence that he made any misrepresentations to them about this endeavor. Thus, the Plaintiffs' claims are limited to the June 2000 transaction.

Those claims are barred by the statute of limitations.  The federal and state securities laws both have a five year statute of repose.  28 U.S.C. § 1658; 815 ILCS 5/13(D).  The state statute bars all types of state law actions arising from the securities transaction, even under other theories of

recovery such as the other state law claims asserted by the Plaintiffs.  Klein v. George C. Kerasotes Corp., 500 F.3d 669, 671-74 (7th Cir. 2007); Tregenza v. Lehman Bros., Inc., 287 Ill.App.3d 108, 109-10, 678 N.E.2d 14, 15 (Ill.App. 1st Dist., 1997).  Here, the membership interests were issued to the Plaintiffs and the stock was sold to AMFAL Investment in June 2000.  The Plaintiffs filed this action more than five years later in September 2005.  The claims against Bentley and RES, thus, are barred.

The Plaintiffs argue that the sale of American Falcon stock was not complete until after September 2000, because the individual Plaintiffs did not receive stock certificates until after that date.  The Court disagrees.  The original transaction called for AMFAL Investment, a limited liability company, to buy the American Falcon stock.  So, of course, the American Falcon stock was not issued to the individual Plaintiffs, but to AMFAL Investment.  The members of AMFAL Investment did not decide to hold the stock personally until February 2001; thus, the shares were not issued to them personally until after that date.  The relevant sale, however, occurred in June 2000.  The claims against Bentley and RES are barred.

II.  CLAIMS AGAINST CHRANS

A.  Counts I and VI Securities Fraud

48

The Securities and Exchange Act § 10(b), and Rule 10b-5 promulgated thereunder, prohibit making a material misrepresentation of fact, or omitting a material fact necessary to make a statement not misleading, in connection with the purchase or sale of a security.  15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.  To overcome summary judgment, the Plaintiffs must present evidence of: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, __ U.S.__, 128 S.Ct. 761, 768 (2008); Ray v. Citigroup Global Markets, Inc., 482 F.3d 991, 994 (7th Cir. 2007). To be material, the representation or omission must significantly alter the total mix of available information.  Acme Propane, Inc. v. Tenexco, Inc., 844 F.2d 1317, 1322 (7th Cir. 1988).  If the plaintiff presents evidence of a material omission, the plaintiff must also present evidence that the defendant had a duty to disclose the information.  Chiarella v. United States, 445 U.S. 222, 234 (1980).

The Illinois Securities law also prohibits fraud in the purchase or sale of securities.  815 ILCS 5/12.  The elements of the state securities fraud

claim parallel the elements of the federal § 10(b) and Rule 10b-5 claim, except that a plaintiff need not prove scienter.   <u>Foster v. Alex</u>, 213 Ill.App.3d 1001, 1003-04, 572 N.E.2d 1242, 1244 (Ill.App. 5th Dist., 1991); <u>Branch-Hess Vending Services Employees' Pension Trust v. Guebert</u>, 751 F.Supp. 1333, 1341 (C.D.Ill., 1990).

Unlike Bentley and RES, Chrans was actively involved in promoting and managing the Plaintiffs' investments in these various entities from June 2000 until May 2005.  The claims based on the June 2000 transaction are barred by the statutes of repose, but the claims based on later events are not so barred.

The other four securities transactions were: (1) the issuance of membership interests in ROTFL in October 2001; (2) the issuance of membership interests in Alpha Foxtrot in January 2003; (3) the issuance of stock in Falcon Air in May or June 2003; and (4) the Trasks' purchase of additional shares of American Falcon from Chehab in December 2003. There is no evidence that Chrans was involved in the December 2003 transaction with the Trasks; thus, the securities claims against Chrans are limited to the ROTFL and Alpha Foxtrot limited liability company membership issuance, and alleged Falcon Air stock fraud.

The evidence generally shows that from February 2001 through the Falcon Air securities transaction in June 2003, Chrans was continually making positive misstatements to Plaintiffs about these related ventures. During the April 26-27, 2001, meeting, Chrans told the Plaintiffs that conditions were favorable for American Falcon's business plan to succeed despite the undercapitalization of Capital.  On or about May 14, 2001, Chrans told the Plaintiffs to ignore the financial statements that showed a $2 million loss from October 2000 to April 2001.  On July 2, 2001, Chrans told the Plaintiffs that American Falcon had lucrative routes and needed more planes to secure more lucrative routes.  Chrans repeatedly told the Plaintiffs that there was nobody better than Chehab to run American Falcon.  On September 21, 2001, Chrans told ROTFL investors that ROTFL would realize from $85,000.00 to $95,000.00 in gross income with positive net cash flow of $26,000.00 to $34,500.00 per month.  On September 15, 2001, Chrans told the Plaintiffs that American Falcon just needed time to be successful.  On September 28, 2001, Chrans the Plaintiffs that the addition of a Boeing 737 to American Falcon would allow American Falcon to take full advantage of the business opportunities that were continuing to flow into the company.  In March 2002, Chrans said that

American Falcon had a bright future.  In September 2002, Chrans told the Plaintiffs that American Falcon would be turning profitable and that the future looked bright.  In December 2002 or January 2003, Chrans told Plaintiffs that the purchase of another Boeing 737 through Alpha Foxtrot would enable American Falcon to begin realizing profits.  In January 2003, Chrans told the Plaintiffs that he anticipated a very profitable year for American Falcon.

In addition, the Plaintiffs present evidence that Chrans made certain specific representations that were false.  After the ROTFL closing, Chrans stated that the $400,000.00 rebate would be used to buy shares of American Falcon for ROTFL.  In June 2003, Chrans told Dr. Baron and Dr. Mallavarapu that the owners of Falcon Air would be the Barons, the Mallavarapus, Chehab and Chrans.[12]  The Plaintiffs have presented evidence that these representations were false.

---

[12]Plaintiffs also present evidence of other specific representations, but do not present evidence that the specific representations were false.  In November 2000, Chrans told the Plaintiffs that American Falcon was attempting to establish a relationship with Air France and needed to borrow $87,750.00 from each AMFAL Investment member to meet requirements set by Air France.  On February 21, 2002, Chrans represented that American Falcon had $9,000,000.00 to $13,000,000.00 in charter revenue under contract.  In December 2002 or January 2003, Chrans said that operating two Boeing 737s would be more efficient than operating one.  In October 2002, Chrans stated that American Falcon's shortage of funds was due to having to renew its insurance policy.  The Plaintiffs present no evidence that any of these representations were false.

The Plaintiffs also present evidence that Chrans concealed certain information from the Plaintiffs.  As Manager of ROTFL and Alpha Foxtrot, and a director of American Falcon, Chrans owed a fiduciary duty to the Plaintiffs as members and stockholders of these entities.  He, thus, had a duty to disclose material information to the Plaintiffs.  Chrans did not tell the Plaintiffs that American Falcon owed $209,000.00 in rent on the F-28 and gave Martin and Mallette additional American Falcon stock in exchange for the forgiveness of that debt.  In August 2001, Chrans did not tell the Plaintiffs that American Falcon borrowed $3,000,000.00 from the Bank and placed the funds in a Certificate of Deposit to inflate American Falcon's cash reserves to satisfy Argentinian regulators.  Chrans did not tell the Plaintiffs that he contributed $335,000.00 of the rebate to American Falcon without receiving anything in return.  In June 2003, Chrans did not tell Drs. Baron and Mallavarapu that the engines on the F-28 were timed out and could not be used.[13]

---

[13]The Plaintiffs also asserted other omissions, but did not present evidence that the claimed omitted facts were true or that Chrans knew of the information.  The Plaintiffs claim that Chrans omitted and concealed the true value of the ROTFL and Alpha Foxtrot planes, but presented no competent evidence of the value of the planes. The Plaintiffs also claim that Chrans concealed the fact that Chehab had not registered the Bank's mortgages on the Alpha Foxtrot and Falcon Air planes, but the Plaintiffs presented no evidence that Chrans knew that Chehab had failed to register the mortgages.

The materiality of the alleged misrepresentation that the Barons and the Mallavarapus would own half of Falcon Air is clear.  It is material to misrepresent to an investor that an investor will own 25 percent of a company when in fact he will have no ownership interest at all.  Also, the concealment that an engine on the F-28 was timed out and could not be put back into service was material.

The materiality of the other misrepresentations is a more difficult question because the Plaintiffs received so much other information about American Falcon.  It is a close question whether Chrans' statements significantly affected the total mix of information available to the Plaintiffs.  While Chrans was making his positive representations, the Plaintiffs were receiving a steady stream of negative information about American Falcon.  In September 2000, the Plaintiffs learned that: American Falcon had failed to acquire its second airplane as anticipated; the F-28 was experiencing mechanical difficulties; and American Falcon needed an additional $2,367,039.00 to keep operating until it could get the planes operating as called for in the PPO.  In February 2001, the Plaintiffs learned that American Falcon: had net losses of ($2,099,360.49) for the fiscal year ending September 31, 2000, and net losses of ($1,193,960.95) for the four

months from October 2000 through January 2001; needed another $1,477,513.00 to cover losses through May 2001; needed an additional $250,000.00 for each month that the planes were not acquired and put into operation; and had a projected negative net income of ($1,104,294.00) for the first quarter of 2001. In April 2001, Chehab reiterated the statement that American Falcon was going to need $250,000.00 per month to stay afloat. Plaintiff Janet Mallavarapu became the Manager of AMFAL Investment in April 2001. She thereafter asked the members to make monthly payments to service the initial AMFAL Investment debt. She also received regular financial statements from Chehab. On May 14, 2001, the Plaintiffs learned that American Falcon had a net loss of ($2,005,551.00) for the period from October 2000 through April 2001. The AMFAL Investment members, including the Plaintiffs, had to make monthly payments to AMFAL Investment to service the loan, and ultimately, sign promissory notes to pay back the Bank. In 2002 and 2003, the Plaintiff couples each paid more than $100,000.00 to help make the monthly payments on the outstanding debts. In the summer of 2002, the Barons and Mallavarapus, as couples, each paid $250,000.00 to buy Dinar, and in their view, this money just disappeared. All of this evidence calls into

question whether Chrans' representations significantly changed the total mix of information. At this point, the Court must view the evidence favorably toward the Plaintiffs. When viewed in that light, the Court concludes that the Plaintiffs have presented enough evidence to raise an issue of fact on the question of materiality.

The Plaintiffs' evidence also indicates that Chrans had the necessary scienter with respect to the ROTFL, Alpha Foxtrot, and Falcon Air transactions. Scienter can be shown by evidence of reckless conduct that presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that he must have been aware of it. S.E.C. v. Gorsek, 222 F.Supp.2d 1099, 1110 (C.D.Ill., 2001). In this case, Chrans described himself as an activist investor. He said that he spent half of his time learning American Falcon's operations. This evidence provides circumstantial proof that he would be aware of the falsity of his representations about the status of American Falcon, and the significance of the omitted information, related to the ROTFL, Alpha Foxtrot, and Falcon Air transactions.

Chrans argues that some of the evidence of misrepresentations and omissions was not pleaded with sufficient specificity in the Second

Amended Complaint.  The Court agrees that the Plaintiffs had to plead the misrepresentations and omissions with specificity.  <u>Fed. R. Civ. P.</u> 9(b). However, the Plaintiffs presented evidence of misrepresentations that were pleaded with specificity.  <u>See</u> <u>Second Amended Complaint</u>, ¶¶ 216(m), (o), (r), (x), (aa); and ¶¶ 217 (l), (n), (t), and (u).  The evidence of other misrepresentations and omissions presented by the Plaintiffs may be considered on the other elements of Plaintiffs' claims, such as intent and reliance.  These elements do not have to be pleaded with specificity.  <u>Fed. R. Civ. P.</u> 8(a), 9(b).  The Court has considered that evidence with respect to those elements.[14]  The evidence, when properly considered, supports the findings of the Court.

Chrans also argues that the securities fraud claims are barred by the statutes of limitation.  In addition to the statutes of repose, the federal securities laws contain a two-year statute of limitation, and the Illinois securities law contains a three-year statute of limitation.  28 U.S.C. § 1658; 815 ILCS 5/13(D).  Chrans argues that the federal claims are all barred by the statute, and all but the Falcon Air claim is barred by the Illinois statute.

---

[14]The agreement and intent elements of the civil conspiracy claim and breach of fiduciary duty claim do not need to be pleaded with particularity.  <u>Fed. R. Civ. P.</u> 8(a); 9(b).

The Plaintiffs respond that the statute did not begin to run until they learned of the fraud and that happened in 2005.

The federal statute of limitation starts to run when the person knows sufficient facts to be put on inquiry notice that he may have a claim.  Law v. Medco Research, Inc., 113 F.3d 781, 785 (7th Cir. 1997).  The state statute starts to run at essentially the same time.  The Illinois statute provides that the time starts to run on "the date upon which the party bringing the action has notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation of this Act."  815 ILCS 5/13(D)(2).

A person is on inquiry notice when he has learned, or should have learned, the facts that he must know to know that he has a claim.  In a securities fraud context, an injured person knows sufficient facts on the date on which the person learned, or should have learned, both that the representations were untrue and that the misrepresentations were knowingly false.  Law, 113 F.3d at 786.  The information available to the injured person with the exercise of reasonable diligence must be "sufficiently probative of fraud-sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated-not only to incite the

victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit." Marks v. CDW Computer Centers, Inc., 122 F.3d 363, 368 (7th Cir. 1997) (quoting Fujisawa Pharmaceutical Co., Ltd. v. Kapoor, 115 F.3d 1332, 1335 (7th Cir. 1997)). The test is applied objectively from the view of the reasonable investor. Law, 113 F.3d at 786.

In this case, the Plaintiffs had large amounts of information that the impressive projections in the PPO were not coming to fruition in 2001, but very little to indicate that Chrans had knowingly lied to them. Chrans and others tied American Falcon's problems to the delays in securing airplanes. Furthermore, Chrans may have convinced the Plaintiffs that he believed what he was saying because he put his own credit on the line with the Plaintiffs; he was part of the 737 Group, and he signed the same guarantees that they signed. A jury could conclude that a reasonable investor would not have notice that Chrans made knowingly false statements until some time after September 2003. Chrans is not entitled to summary judgment on the securities claims based on the statute of limitations.

B.    Counts II and IV Fraud and Fraudulent Concealment

The Plaintiffs' evidence also supports claims for common law fraud

and fraudulent concealment.  The elements of fraud are: (1) a false statement of fact, (2) known to be false by the party making the statement, (3) made with the intent to induce the other party to act, (4) action by the other party based on justifiable reliance on the statement, and (5) damage. Magna Bank of Madison County, 604 N.E.2d at 545.  The elements of fraudulent concealment are the same as fraud except that, instead of a misrepresentation of fact, the plaintiff must show that the defendant concealed a material fact when it had a duty to disclose that fact.  W.W. Vincent and Co. v. First Colony Life Ins. Co., 351 Ill.App.3d 752, 814 N.E.2d 960 (Ill.App. 1st Dist., 2004).  A jury could conclude that Chrans made misrepresentations and omissions intentionally to defraud the Plaintiffs and that the Plaintiffs relied on those misrepresentations to their detriment.  Chrans' fiduciary position as Manager of ROTFL and Alpha Foxtrot, and a director of American Falcon, could create a duty to disclose the omissions.  The fiduciary relationship is enough to put the fraudulent concealment claim to the jury.

C.    Count III Negligent Misrepresentation

The Plaintiffs, further, are entitled to proceed on their negligent misrepresentation claim against Chrans.  The elements of a negligent

misrepresentation claim are: (1) a false statement of material fact or an omission of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage; and (6) a duty on the party making the statement to communicate accurate information. First Midwest Bank N.A. v. Stewart Title Guar. Co., 218 Ill.2d 326, 334-35, 843 N.E.2d 327, 332 (Ill., 2006). See Zimmerman v. Northfield Real Estate, Inc., 156 Ill.App.3d 154, 163, 510 N.E.2d 409, 414 (Ill.App. 1st Dist., 1986) (material omissions resulting in a failure to provide adequate information is sufficient to support a claim of negligent misrepresentation). Plaintiffs must present evidence that Chrans was in the business of providing information to others. Chrans provided information to others through the consulting business at RES. It is unclear the extent to which his relationship to the Plaintiffs was based on his business activities at RES, but there is enough of a connection to put the matter to a jury. The other elements of the claim are clearly present.

D. Count V Consumer Fraud Act Claim

The Plaintiffs' evidence further supports a Consumer Fraud Act claim.

The Consumer Fraud Act prohibits deceptive conduct in connection with the offering or advertising for sale of property in trade or commerce. 815 ILCS 505/2. The elements of a consumer fraud claim are: (1) a deceptive act or practice by the defendant; (2) the defendant intended the plaintiff to rely on the deception; (3) the deception occurred in the course of conducting trade or commerce; (4) the plaintiff suffered actual damage; and (5) the damage was proximately caused by the deception. Oliveira v. Amoco Oil Co., 201 Ill.2d 134, 776 N.E.2d 151, 160 (Ill., 2002). The intent required is only the intent that the plaintiff rely on the deceptive act, not that the defendant intend to deceive. Thus, a Consumer Fraud Act claim may be based on a deceptive act done negligently or innocently if the defendant intended that the plaintiff rely on the act or practice. Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Development Co., 197 Ill.App.3d 948, 953, 557 N.E.2d 246, 250 (Ill.App. 1st Dist., 1990). The Plaintiffs' evidence, if believed, shows that Chrans committed deceptive acts in trade or commerce with the intent to induce the Plaintiffs to invest in ROTFL, Alpha Foxtrot, and Falcon Air and to keep contributing money to all of these ventures. The Plaintiffs were damaged thereby. The Plaintiffs may proceed with the Consumer Fraud Act claim

against Chrans.

E.    Count VIII Breach of Fiduciary Duty

The evidence also supports a claim for breach of fiduciary duty by Chrans. A fiduciary relationship may arise when one individual places trust and confidence in another who, as a result, gains influence and superiority over the other. Citicorp Sav. of Illinois v. Rucker, 295 Ill.App.3d 801, 692 N.E.2d 1319, 1335 (Ill.App. 1st Dist., 1998). Chrans was the Manager of AMFAL Investment, ROTFL and Alpha Foxtrot, and a director of American Falcon. He owed a fiduciary duty to the Plaintiffs as members and stockholders. The Plaintiffs have presented evidence that he committed fraud as discussed above. In addition, he committed other specific acts that could be considered a breach of his duties: Chrans contributed $335,000.00 of ROTFL funds to American Falcon without receiving any additional equity in American Falcon or other compensation for the members of ROTFL; he gave Chehab a general power of attorney for ROTFL, Alpha Foxtrot, and Falcon Air; he sold over $5,000,000.00 in ROTFL and Alpha Foxtrot's receivables to Chehab for $40.00; and he caused ROTFL and Alpha Foxtrot to give the Bank unlimited guarantees of Chehab's debt to the Bank. All of these actions could be construed as a breach of his fiduciary duties to the

Plaintiffs.   Chrans argues that his decisions were reasonable under the business judgment rule and were not breaches of his fiduciary duty, but that is a factual issue for the jury.   The Plaintiffs have presented evidence to support a claim for breach of fiduciary duty against Chrans.

F.   Count XII Civil Conspiracy

The evidence supports a claim for civil conspiracy between Chrans and Chehab.   A civil conspiracy claim is an intentional tort that requires proof that a defendant knowingly and voluntarily participated in a common scheme to commit an unlawful act or a lawful act by unlawful means. McClure v. Owens Corning Fiberglas Corp., 188 Ill.2d 102, 134, 720 N.E.2d 242, 258 (Ill., 1999).   According to the Plaintiffs' evidence, Chrans and Chehab worked in concert to induce the Plaintiffs to put more and more money into this endeavor.   They both promoted the ROTFL and Falcon Air transactions.   According to the Plaintiffs' evidence, they both deceived Drs. Baron and Mallavarapu into believing they would receive part ownership of Falcon Air.   They both induced Mallavarapu to invest another $500,000.00 on January 31, 2005, but never used the money to invest in another plane, and never told Mallavarapu what happened to the funds. There is ample evidence of an agreement by these two men to engage in

concerted activity to defraud the Plaintiffs.

THEREFORE, Defendants Steven Bentley and Real Estate Systems of Gillette, Inc.'s Motions for Summary Judgment (d/e 144 & 145) are ALLOWED.  Judgment is entered in favor of Defendants Steven Bentley and Real Estate Systems of Gillette, Inc. and against Plaintiffs.  Defendants Bentley and Real Estate Systems of Gillette, Inc. are dismissed from this case.  Defendant Bank of Springfield's Motion for Summary Judgment (d/e 141), and Defendants Michael McGlasson and James Kelley's Motion for Summary Judgment (d/e 142) are denied as moot.   Defendant Willis Chrans' Motion for Summary Judgment (d/e 143) is ALLOWED in part. Partial judgment is entered in favor of Defendant Chrans with respect to the claims arising from the June 2000 formation of AMFAL Investment and the purchase of American Falcon stock by AMFAL Investment; the Court finds that claims with respect to this transaction are barred by the statute of limitations.  The Motion is otherwise denied.

IT IS THEREFORE SO ORDERED.

ENTER:  July 21, 2008

FOR THE COURT:

_____s/  Jeanne E. Scott_____

65

JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE